EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. José Alfonso Serrano Muñoz, su esposa María Rosa Freiría Mendía y la Sociedad de Gananciales constituida por ambos<br><br>Recurridos<br><br>vs.<br><br>Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (Hospital Auxilio Mutuo) y otros<br><br>Peticionarios | Certiorari<br><br>2007 TSPR 132<br><br>171 DPR _____ |

Número del Caso: CC-2005-888
         Cons.: CC-2005-903
                CC-2005-904

Fecha: 26 de junio de 2007

Tribunal de Apelaciones:

              Región Judicial de San Juan Panel I


Juez Ponente:

              Hon. Carlos J. López Feliciano


Abogados de la Parte Peticionaria:

              Lcdo. Juan T. Peñagarícano, Jr.
              Lcdo. Iris M. Monrouzeau
              Lcdo. Michel J. Godreau Robles
              Lcdo. Hugo Rodríguez Díaz
              Lcdo. Ruy V. Díaz Díaz
              Lcdo. Luis Sánchez Betances

Abogados de la Parte Recurrida:

              Lcdo. Álvaro R. Calderón, Jr.
              Lcdo. Cesar T. Andreu-Megwinoff


Materia: Injunction; Daños y Perjuicios


     Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dr. José Alfonso Serrano
Muñoz, su esposa María Rosa
Freiría Mendía y la Sociedad
de Gananciales constituida
por ambos

        Recurridos

                          CC-2005-888
                          *CERTIORARI*
      vs.
                          CC-2005-903
Sociedad Española de Auxilio     CC-2005-904
Mutuo y Beneficencia de
Puerto Rico (Hospital Auxilio
Mutuo) y otros

        Peticionarios

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 26 de junio de 2007

La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (SEAM) construyó, en una parcela de su propiedad, un edificio conocido como Torre del Auxilio Mutuo, para uso exclusivo de oficinas médico-dentales con espacios comerciales y de servicios; ello con el objetivo de ampliar y fortalecer los servicios ambulatorios, los servicios médicos y las facilidades que ofrece el Hospital Auxilio Mutuo.

El edificio Torre del Auxilio Mutuo (Torre) quedó sometido al régimen de propiedad horizontal mediante la Escritura Matriz Número Dos (2), del 1 de mayo de 2000, otorgada por la SEAM ante el Notario Luis Oscar Ramos Hernández. En dicha

escritura, se estableció el uso que habría de tener cada oficina ubicada en la Torre.

A esos efectos, en la cláusula quinta de la escritura matriz se incluyó un listado taxativo en el cual se estableció la especialidad dentro de la práctica de la medicina a la cual se dedicaría cada oficina. En lo aquí pertinente, se estableció que la oficina 518 estaría destinada a la práctica de la Otorrinolaringología, mientras que la oficina 702 estaría destinada a la práctica de la Cardiología.[1]

A su vez, en la cláusula vigésimo séptima de la escritura matriz se estableció, en lo pertinente, que:

> (a) Habiéndose construido este Edificio esencialmente para médicos, dentistas y profesionales de la salud, en cumplimiento con la Ley de Propiedad Horizontal de Puerto Rico, según enmendada, se establecen clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina,

---

[1] Según surge del expediente y de la Sentencia emitida por el Tribunal de Primera Instancia, durante la etapa de planificación inicial de la Torre se sometieron varias propuestas respecto a la asignación de especialidades médico-dentales a las oficinas ubicadas en la Torre. La distribución o mezcla inicial sólo vislumbraba cinco oficinas para la práctica de la Cardiología. La distribución o mezcla inicial fue variando a medida que se fue desarrollando el proyecto, conforme a la variación en la demanda y a la especialidad de los facultativos médicos del Hospital Auxilio Mutuo interesados en adquirir una oficina en la Torre. La SEAM y los médicos interesados suscribían un contrato de opción de compraventa en el que se indicaba la especialidad a la cual se dedicaría la oficina opcionada. Luego de opcionadas la mayor parte de las oficinas, se otorgó e inscribió en el Registro de la Propiedad la Escritura Matriz de la Torre, con el listado taxativo antes mencionado. En dicho listado taxativo aparece un número total de quince oficinas destinadas a la práctica de la Cardiología.

según el listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO. En el futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador que adquiera el título de la unidad u oficina o su sucesor, arrendatario o cesionario, usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura. Solamente se podrá variar el uso o los usos específicos a los que se destinó la unidad u oficina:

(1) cuando sea para una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura; (2)cuando el titular de la unidad previamente requiera y obtenga el consentimiento unánime por escrito de los condómin[o]s, según dispuesto en el ordenamiento legal vigente, para variar el uso o los usos señalados en la Cláusula QUINTO para la unidad u oficina.[2]

...

(e) El titular que en el futuro continúe estudios subespecializados en instituciones académicas reconocidas por las autoridades federales y locales, y que así lo acrediten fehacientemente, al igual que haber recibido las aprobaciones gubernamentales pertinentes para ejercer la mencionada subespecialidad, dicha subespecialidad será incorporada para siempre en los usos de la oficina del titular.[3]

---

[2] El 24 de abril de 2000 la SEAM aprobó el Reglamento para la Administración del Condominio Torre del Auxilio Mutuo. La escritura matriz de la Torre, especialmente las cláusulas quinta y vigésimo séptima de la misma, se hicieron formar parte del Reglamento.

[3] En el inciso b de la cláusula 27 se establece lo siguiente: "[c]uando se fuere a traspasar la titularidad por cualquier forma, se debe seguir el estricto orden: 1. El titular o sus herederos tasarán la propiedad a través de un profesional acreditado para ello. 2. Notificarán por correo certificado con acuse de recibo a la Administración del Condominio con el precio de venta según tasación que se acompaña. 3. La Asamblea notificará inmediatamente al Consejo de Titulares y a todas las partes interesadas de la oferta de venta y quienes a su vez tendrán sesenta días (60) a partir de la fecha de la

Así las cosas, el 18 de abril de 2001, la SEAM le vendió al doctor José Alfonso Serrano Muñoz --cardiólogo de profesión-- y a su esposa, María Rosa Freiría Mendía, la oficina 702,la cual se encuentra destinada, según antes expresáramos, a la práctica de la Cardiología.[4] En la

------

notificación de la Administración para contestar por escrito a éstos su aceptación de comprar la oficina por el precio tasado. 4. Tendrán preferencia en la compra de la oficina en el siguiente orden: a) Los titulares de la misma práctica profesional para dedicarla al mismo uso del que la adquiere; b) En su ausencia los demás titulares para dedicarla al uso al cual ellos dedican la suya en el Condominio; c) En su ausencia la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico Inc., quien es también titular para dedicarla al uso para el cual el vendedor la utilizaba; d) En su ausencia cualquier profesional de la Facultad Médica del Hospital Auxilio Mutuo para dedicarla al uso para el cual está acreditado el comprador a ejercer su profesión; e) En el caso de que dos propuestas o más sean recibidas por el vendedor, éste último seleccionará la que esté en preferencia según el orden antes señalado. En caso de estar las ofertas recibidas en la misma preferencia, el vendedor seleccionará la misma a su entera discreción; f) En su ausencia después de transcurrir los sesenta (60) días del aviso de la Administración, sin recibirse contestación de los interesados, podrá vender el titular o sus herederos, por el precio que estimen razonable, a cualquier profesional de la salud acreditado en el país para ejercer su práctica profesional en el campo médico-dental.

[4] Dicha compraventa se efectuó mediante la Escritura Número 158 sobre Individualización de Unidad de Condominio y Compraventa, otorgada ante el notario Francisco M. Vázquez Santoni. Previo a ello, el 15 de mayo de 2006, la SEAM y el doctor Serrano suscribieron un contrato de opción de compra en el cual se estableció que: "[l]as partes acuerdan que, en armonía con el Artículo 2 ... de la Ley de Propiedad Horizontal de Puerto Rico, el uso exclusivo al cual se dedicará la oficina número 702 ..., objeto de este contrato, será Cardiología. Este uso al que se destina la oficina se incorporará a la Escritura Matriz del inmueble y el mismo sólo podrá ser variado mediante el consentimiento de los titulares de acuerdo con lo requerido por la Ley de Propiedad Horizontal de Puerto Rico, según enmendada".

correspondiente escritura de individualización y compraventa, se incorporó la cláusula vigésimo séptima de la escritura matriz.

El 18 de abril de 2002, la SEAM, en calidad de vendedora, el doctor Pedro Redondo Díaz, en calidad de comprador, y el doctor Rafael Lastra Hernández, en calidad de codeudor, suscribieron un contrato de promesa de compraventa, en el cual la SEAM se comprometió a vender la oficina 518 para el uso exclusivo de la Cardiología. En este contrato incorrectamente se certificó que, en la escritura matriz de la Torre, la oficina 518 se encontraba destinada a la práctica de la Cardiología. No obstante, en la escritura matriz, la oficina 518 aparece destinada a la práctica de la Otorrinolaringología.[5]

El 18 de junio de 2002, la SEAM le cursó una carta a los titulares de la Torre notificándoles que los condóminos de la oficina 516 --los cardiólogos Rafael Lastra Hernández, Jorge Lastra Inserni y Pedro Redondo Díaz-- deseaban adquirir la oficina 518 para dedicarla a la especialidad de Cardiología y expandir la práctica que

---

[5] Específicamente, la cláusula 2 de dicho contrato establece que: "LA VENDEDORA se compromete a vender y LA COMPRADORA se compromete a comprar la Oficina Número 518, para el uso exclusivo de la Oficina de Cardiología. LA COMPRADORA reconoce y acepta que este uso al que se destina la oficina aparece incorporado a la ESCRITURA MATRIZ del inmueble y que el mismo sólo podrá ser variado mediante el consentimiento de los titulares y de conformidad con lo requerido por la Ley de Propiedad Horizontal de Puerto Rico, vigente. La propiedad está construida y la distribución interior será la existente".

actualmente tienen.[6] En dicha misiva, se les indicó a los titulares que ello implicaba un cambio de uso, puesto que la oficina 518 se encontraba destinada a la práctica de la Otorrinolaringología en la escritura matriz. Se les concedió a los titulares un término de 60 días para oponerse a la compraventa, apercibiéndoseles que de no recibirse objeciones escritas en dicho término la SEAM procedería a culminar el proceso de compraventa.[7]

Conforme a lo expuesto en la misiva enviada por la SEAM, el 20 de junio de 2002 el doctor Serrano le envió al Sr. Joaquín Quiñoy --Presidente de la Comisión de Administración de la SEAM-- una carta oponiéndose al cambio de uso propuesto para la oficina 518.[8] A pesar de dicha oposición, el 30 de septiembre de 2002, la SEAM le vendió al doctor Pedro Redondo Díaz y a su esposa, Cynthia

---

[6] Según surge del expediente, el doctor Rafael Lastra Hernández, el doctor Jorge Lastra Inserni y el doctor Pedro Redondo Díaz ejercían su práctica de la Cardiología en la oficina 516, la cual es contigua a la oficina 518 en cuestión. La oficina 516, a diferencia de la oficina 518, sí se encuentra destinada a la práctica de la Cardiología en la Escritura Matriz de la Torre. A pesar de que el doctor Redondo Díaz ejercía su práctica en la oficina 516, éste no es dueño o titular de dicha oficina.

[7] Dicha carta fue cursada por la SEAM a través del Sr. Joaquín Quiñoy, Presidente de la Comisión de Administración de la SEAM.

[8] La carta enviada por el doctor Serrano lee como sigue: "[s]irva la presente para notificarle mi oposición al cambio de uso propuesto por ustedes, en su comunicación del 18 de junio de 2002, para la oficina 518 del Condominio Torre del Auxilio Muto".

Elizabeth Rivera, la oficina 518 para la práctica de la Cardiología.[9]

Ante ello, el 6 de junio de 2003 el doctor Serrano y su esposa presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda sobre *injunction* y daños y perjuicios en contra de la SEAM, el doctor Rafael Lastra Hernández, el doctor Jorge Lastra Inserni y el doctor Pedro Redondo Díaz y su esposa. Alegaron, en síntesis, que la SEAM varió el uso de la oficina 518 en clara violación a la escritura matriz de la Torre, debido a que no contaba con el consentimiento unánime de los titulares. Solicitaron que el tribunal de instancia dictara un *injunction* prohibiéndoles a los demandados usar la oficina 518 para algún fin distinto a la Otorrinolaringología. Solicitaron, además, una indemnización por los daños que le causó la actuación contraria a las disposiciones de la escritura matriz.

La SEAM contestó la demanda y adujo, como defensa, que las restricciones de uso desglosadas en la cláusula quinta de la escritura matriz sólo aplican luego de

---

[9] Según surge del expediente, la compraventa de la oficina 518 se efectuó mediante la Escritura Número 530 sobre Individualización de Unidad en Condominio y Compraventa ante la Notario Adela Surillo Gutiérrez. Dicho negocio jurídico constituyó la individualización y primera venta de la oficina 518. A pesar de que la SEAM --mediante la carta enviada a los titulares de la Torre-- indicó que los doctores Rafael Lastra Hernández y Jorge Lastra Inserni figuraban, junto con el doctor Pedro Redondo Díaz, como compradores de la oficina 518, en la escritura de compraventa sólo compareció el doctor Pedro Redondo Díaz y su esposa como parte compradora.

realizada la individualización y primera venta de la unidad u oficina. Adujo, además, que el cambio efectuado no varió el número total de oficinas destinadas a la Cardiología en la escritura matriz.

Por otro lado, el doctor Redondo Díaz y su esposa contestaron la demanda y adujeron que compraron la oficina 518 ya que la SEAM les afirmó que no había objeción alguna para que adquirieran dicha oficina. Adujeron, además, que de haber tenido conocimiento de la objeción no hubiesen llevado a cabo la compraventa.

Por último, los doctores Rafael y Jorge Lastra comparecieron alegando, como defensa afirmativa, que no son dueños ni tienen interés propietario alguno en la oficina 518.

El Tribunal de Primera Instancia celebró vista en su fondo. En ésta, el doctor Serrano y su esposa presentaron amplia prueba documental y testifical. Los demandados, luego de presentar una moción al amparo de las disposiciones de la Regla 39.2 de Procedimiento Civil y ser denegada la misma por el foro de instancia --así como ser declarados sin lugar los recursos de *certiorari* que, respecto a dicha determinación, radicaron ante el Tribunal de Apelaciones y este Tribunal-- sometieron su caso sin presentar prueba en el tribunal de instancia.[10] Tras varios

---

[10] Luego de concluir el desfile de prueba del doctor Serrano y su esposa --parte demandante-recurrida-- los demandados, repetimos, solicitaron la desestimación de la

incidentes procesales, el tribunal de instancia emitió sentencia <u>desestimando</u> la demanda e imponiéndoles al doctor Serrano y a su esposa la suma de $1,000.00 por temeridad, a favor de los doctores Jorge y Rafael Lastra, por no ofrecer prueba alguna que vinculara a estos últimos con la compraventa u ocupación de la oficina 518.

Dicho foro determinó que, mediante la cláusula vigésimo séptima de la escritura matriz, la SEAM insertó una reserva o escapatoria que le permitía variar el uso asignado a una oficina antes de su primera venta, sin necesidad de obtener el consentimiento unánime de los otros titulares del condominio. Sostuvo el foro primario que dicha reserva o escapatoria no es contraria a las disposiciones de la Ley de Propiedad Horizontal que requiere el consentimiento unánime de los titulares para un cambio de uso; ello debido a que dicho consentimiento se obtuvo a través de las escrituras de compraventa de cada unidad u oficina de la Torre, en las cuales se

---

demanda de acuerdo con la Regla 39.2 (c) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III. El Tribunal de Primera Instancia <u>denegó</u> dicha solicitud, por lo cual las partes afectadas recurrieron al Tribunal de Apelaciones y a este Tribunal en revisión de dicha denegatoria. Tanto el Tribunal de Apelaciones como este Tribunal <u>denegaron</u> la revisión solicitada y el caso fue devuelto al Tribunal de Primera Instancia para la continuación de los procedimientos.

transcribió íntegramente el texto de la cláusula vigésimo séptima de la escritura matriz.[11]

Por último, el foro de instancia determinó que, aunque hipotéticamente la SEAM estuviese impedida de variar el uso de la oficina 518, debido la oposición del doctor Serrano, el doctor Redondo Díaz y su esposa son adquirentes de buena fe protegidos por la tercería registral. Expuso que el doctor Redondo Díaz y su esposa no tuvieron conocimiento de la oposición del doctor Serrano y que confiaron en las constancias del registro que claramente indicaban que la SEAM podía realizar el cambio de uso.

Inconformes, el doctor Serrano y su esposa acudieron al Tribunal de Apelaciones.[12] El tribunal apelativo intermedio dictó _sentencia revocatoria_, expidiendo el _injunction_ solicitado y ordenó la devolución del caso al foro de instancia para que se celebrara una vista dirigida a determinar la existencia y valoración de los daños reclamados por el doctor Serrano y su esposa.

_____

[11] Citó en apoyo a su determinación a Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538 (1991), en el cual este Tribunal resolvió que el consentimiento unánime de los titulares puede obtenerse mediante las escrituras de compraventa.

[12] Previo a acudir al Tribunal de Apelaciones, el doctor Serrano y su esposa presentaron ante el Tribunal de Primera Instancia una moción de determinaciones de hecho y conclusiones de derecho adicionales, de acuerdo con la Regla 43.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III. Dicha moción fue declarada no ha lugar mediante orden emitida por el foro de instancia el 20 de diciembre de 2004.

El foro apelativo intermedio señaló que, aunque el consentimiento de los titulares a una variación de uso puede obtenerse a través de las escrituras de compraventa, "ello requiere que la expresión sea clara y precisa para que se obtenga un consentimiento informado e inequívoco a tales propósitos". Determinó que, en el presente caso, la cláusula vigésimo séptima no cumple con este requisito.

El tribunal apelativo intermedio concluyó, además, que el doctor Redondo Díaz y su esposa no son terceros registrales, ya que no adquirieron en función de un registro inexacto. Señaló que del registro surgía claramente que la oficina 518 estaba destinada a la práctica de la Otorrinolaringología y que, ante la inexistencia de un documento que acreditara la variación del uso de la oficina y la inscripción del mismo en el Registro, los esposos Redondo no podían alegar desconocimiento de la realidad registral.

Por último, el Tribunal de Apelaciones determinó que no procedía la imposición de temeridad al doctor Serrano y su esposa por haber incluido como partes demandadas a los doctores Rafael y Jorge Lastra. Señaló que ambos doctores fueron correctamente incluidos como parte demandada debido a que la propia carta circulada por la SEAM indicaba que los doctores Lastra, junto con el doctor Redondo Díaz, estaban interesados en adquirir la oficina 518. El foro apelativo intermedio señaló, además, que el doctor Rafael Lastra Hernández fue parte activa del negocio de

compraventa; ello en vista de que en el contrato de promesa de compraventa aparece su firma como co-deudor.

Insatisfechos, la SEAM, los doctores Rafael y Jorge Lastra y el doctor Pedro Redondo Díaz y su esposa, acudieron ante este Tribunal mediante sendos recursos de *certiorari*[13], aduciendo, en síntesis, que el tribunal apelativo intermedio incidió:

> 1. al descartar la norma establecida en Parkside que permite reservas a favor del desarrollador para cambios de uso de áreas en los condominios, siempre que éstas consten en la escritura matriz y en todas las de compraventa;

> 2. al no considerar que la oposición del demandante al cambio de uso de la oficina carecía de fundamento alguno y violentó la buena fe contractual;

> 3. al negarle a los codemandados esposos Redondo-Rivera el carácter de terceros registrales, protegidos en su adquisición de una oficina para la cardiología;

> 4. al dejar sin efecto la imposición de temeridad a favor de los doctores Rafael y Jorge Lastra;

> 5. al sustituir la apreciación de la prueba y las determinaciones de hecho que hizo el TPI en ausencia de error, pasión, prejuicio o parcialidad.[14]

---

[13] La SEAM compareció ante este Tribunal mediante el recurso CC-2005-888, los doctores Rafael Lastra Hernández y Jorge Lastra Inserni mediante el recurso CC-2005-903 y el doctor Redondo Díaz y su esposa mediante el recurso CC-2005-904.

[14] Previo a acudir a este Tribunal, todos los demandados solicitaron reconsideración ante el Tribunal de Apelaciones. El tribunal apelativo intermedio denegó dicha solicitud y se reafirmó en la sentencia previamente emitida.

El 27 de enero de 2006 emitimos Resolución mediante la cual ordenamos la consolidación y expedición de los recursos presentados. Contando con la comparecencia de las partes y estando en posición de resolver, procedemos a así hacerlo.

I

Conforme al trasfondo fáctico antes expuesto, nos corresponde resolver las siguientes controversias:

A.  ¿Se constituyó mediante la cláusula vigésimo séptima de la escritura matriz una reserva o escapatoria, a favor de la SEAM, válida en nuestro ordenamiento jurídico? De no ser válida, ¿se requería el consentimiento unánime posterior de los titulares para el cambio de uso de la oficina 518?;

B.  ¿La oposición del doctor Serrano violentó los principios de buena fe que rigen en nuestro ordenamiento jurídico?;

C.  De requerirse el consentimiento unánime y de ser válida la oposición del doctor Serrano, ¿se encuentran los esposos Redondo protegidos por la tercería registral?;

D.  ¿Procede la imposición de temeridad en contra del doctor Serrano y su esposa por haber incluido como parte demandada a los doctores Rafael y Jorge Lastra?; y, por último,

E. ¿Erró el Tribunal de Apelaciones al no darle deferencia a la apreciación de la prueba y las determinaciones de hecho del Tribunal de Primera Instancia?

II

El Artículo 2 de la Ley de Propiedad Horizontal, <u>vigente al momento de los hechos y aplicable a las controversias aquí planteadas</u>[15], Ley Núm. 104 del 25 de junio de 1958, según enmendada por la Ley. Núm. 157 del 4 de junio de 1976, disponía, en lo pertinente que: "...[l]a escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una

_____

[15] Aun cuando la nueva Ley de Condominios, aprobada el 5 de abril de 2003, tiene efectos retroactivos, dicho efecto no se extiende al caso hoy ante nuestra consideración. En <u>Consejo de Titulares v. Williams Hospitality Group, Inc.</u>, res. el 1 de junio de 2006, 2006 TSPR 94, dispusimos que el efecto retroactivo de la Ley de Condominios no podrá afectar <u>derechos adquiridos</u> por las partes en virtud de la legislación anterior. "El derecho adquirido… es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior".

En el presente caso, los asuntos medulares en controversia, entiéndase, la escritura matriz de la Torre, el cambio de uso de la oficina 518 y la oposición del doctor Serrano, se consumaron durante la vigencia de la Ley de Propiedad Horizontal y ciertamente, el doctor Serrano, parte afectada, descansó en dicho estado de derecho anterior al momento de oponerse al cambio de uso propuesto.

vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares".[16]

Conforme a lo antes expuesto, en Consejo Tit. C. Parkside v. MGIC Fin. Corp., ante, expresamos que el uso de un área puede variarse válidamente si se obtiene el consentimiento de los compradores mediante las escrituras de compraventa o si, posteriormente, de forma unánime los condóminos consienten al cambio. En aquella ocasión, citamos con aprobación a Arce Preston v. Carribbean Home Construction Corp., 108 D.P.R. 225 (1978), en el cual establecimos que un desarrollador estaba impedido de variar el uso proyectado a un área sin haberles aclarado a los compradores sobre el cambio al firmarse las escrituras de compraventa, o sin el consentimiento ulterior unánime de los condóminos.

---

[16] La nueva Ley de Condominios no varió significativamente el Artículo 2 aquí citado. El Artículo 2 de la nueva Ley, en lo que aquí respecta, dispone que: "... [l]a escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que esta Ley autorice lo contrario, una vez fijado dicho destino y uso sólo podrá ser variado mediante el consentimiento unánime de los titulares".

No obstante, la nueva Ley, en su Artículo 38 (d), 31 L.P.R.A. § 1293b, permite que en los condominios exclusivamente comerciales o profesionales, las dos terceras partes de los titulares, que a su vez reúnan las dos terceras partes de las participaciones en los elementos comunes del inmueble, varíen el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz. Esta disposición no es de aplicación al presente caso.

Ello, no obstante, dejamos <u>meridianamente claro</u> que la expresión que se haga a esos efectos en las escrituras de compraventa debe ser "una expresión lo suficientemente <u>clara y precisa</u> como para plasmar un consentimiento informado e inequívoco a tales propósitos". <u>Consejo Tit. C. Parkside v. MGIC Fin. Corp.</u>, ante, pág. 554.

Posteriormente, en <u>Condominio Profesional San Juan Health Centre v. PRF, Inc.</u>, 133 D.P.R. 488 (1993), --decisión que, por las razones que expresaremos a continuación, <u>no</u> es de aplicación a los hechos del presente caso-- decretamos la nulidad de una reserva de variación de uso a favor de la desarrolladora de un condominio médico-hospitalario, la cual fue incorporada a la escritura matriz del inmueble. En dicho caso, se trataba de una reserva que facultaba a la desarrolladora a "variar [unilateralmente] el uso y destino de los apartamientos y áreas del edificio que retenga y/o adquiera en el futuro".

Al respecto, resolvimos que la reserva a favor de la desarrolladora --mediante la cual retuvo el derecho unilateral a variar el uso de todo apartamento o área que retuviese o adquiriese en el futuro-- es <u>contraria</u> a las claras disposiciones de la Ley. Concluimos que "la fuerza vinculante de los pactos y condiciones impuestas en la escritura matriz o reglamento no pueden contravenir las disposiciones de la ley o ser contrarias a la moral o al orden público".

III

Conforme al trasfondo doctrinal antes expuesto, pasamos a resolver la primera controversia hoy ante nuestra consideración, a saber: si mediante la cláusula vigésimo séptima de la escritura matriz la SEAM constituyó a su favor una reserva válida en nuestro ordenamiento jurídico.

De entrada, resulta pertinente señalar que lo resuelto en Condominio Profesional San Juan Health Centre v. PRF, Inc., ante, no es de aplicación al presente caso. Nuestras expresiones en Condominio Profesional San Juan Health Centre v. PRF, Inc., ante, estuvieron dirigidas a declarar nula toda reserva, que al igual que la allí analizada, sea incondicional y faculte a un desarrollador a variar el uso designado a un área, sin que medien restricciones que delimiten dicha facultad, sobretodo, su extensión o duración. Ante la particularidad de la reserva de variación de uso analizada en Condominio Profesional San Juan Health Centre v. PRF, Inc., ante, lo allí resuelto no constituye una camisa de fuerza que nos impida reconocer la validez de una reserva de variación de uso que, además de ser clara y precisa, cumpla con otros criterios que restrinjan y delimiten la facultad reconocida en la reserva, como lo son la imposición de condiciones.

Extender la norma pautada en Condominio Profesional San Juan Health Centre v. PRF, Inc., ante, al presente

caso significaría que toda reserva a favor de un desarrollador respecto a una variación de uso es nula en nuestro ordenamiento. Nada más lejos de la verdad. Ciertamente, fútil sería que reconozcamos la posibilidad de obtener el consentimiento de los compradores a un cambio de uso mediante las escrituras de compraventa, si todas las reservas de variación de uso a favor de un desarrollador no tienen cabida en nuestro ordenamiento jurídico.

La validez de una u otra reserva de variación de uso dependerá de un análisis caso a caso que, sin ánimos de ser taxativos, tome en consideración los siguientes factores: 1) la inclusión de la reserva en la escritura matriz del condominio y en las escrituras de compraventa de cada unidad, oficina o apartamento; 2) la redacción clara y precisa de la reserva, que no de margen a especulaciones o interpretaciones distintas; 3) el apercibimiento a los compradores de que mediante la firma de la escritura de compraventa consienten a la reserva; 4) la existencia de condiciones que delimiten la facultad concedida en la reserva, sobretodo, que la facultad del desarrollador a variar el uso no sea perpetua; 5) el uso al cual originalmente se encuentra destinada el área, unidad u oficina en cuestión; y 6) que la reserva sea razonable y responda a fines legítimos.

Aclarada la posibilidad de constituirse una reserva válida de variación de uso a favor de un desarrollador,

pasamos a resolver si en el presente caso efectivamente se constituyó una reserva válida que cumpla con los criterios antes expuestos. Respondemos en la negativa. Luego de un detenido examen de la cláusula vigésimo séptima en cuestión, somos del criterio que ésta no cumple con los requisitos de claridad y precisión requeridos. Así lo confirma el ambiguo lenguaje utilizado en dicha cláusula. Veamos.

La SEAM sostiene que mediante la cláusula vigésimo séptima de la escritura matriz --específicamente al utilizar los términos "en el futuro" y "luego de realizada la individualización de la unidad u oficina"-- dejó establecido que las restricciones de uso no le aplican y que, por lo tanto, estaba facultada para variar los usos especificados, siempre que fuese antes de la individualización y primera venta de cada unidad u oficina. Aducen que la reserva es válida porque se limita a cambios de uso anteriores a la primera venta de las unidades u oficinas y porque responde a un fin legítimo, a saber, evitar que la SEAM no pueda vender las oficinas para cuya especialidad no exista demanda. No le asiste la razón.

Si la intención de la SEAM fue reservarse la facultad limitada de variar el uso de una unidad u oficina antes de su individualización o primera venta, así debió establecerlo expresamente en la escritura matriz y en cada una de las escrituras de compraventa. Es decir, debió

insertar expresamente que, previo a la individualización y primera venta de las unidades u oficinas, se reservaba la facultad de variar el uso destinado a la mismas, y apercibirles a los compradores que mediante la firma de las escrituras de compraventa consentían a que el desarrollador llevase a cabo los cambios de uso, bajo los términos y condiciones de la reserva.

No lo hizo. En vista de ello, concluimos que la cláusula vigésimo séptima en cuestión no constituye una expresión lo suficientemente clara y precisa como para plasmar el consentimiento informado e inequívoco de los compradores de la Torre a la reserva reclamada por la SEAM.

La ambigüedad del lenguaje utilizado en la referida cláusula queda confirmada por el testimonio de los diferentes testigos que declararon durante el juicio. En la vista en su fondo, testificó el ingeniero Manuel E. Ares Ubarri. Éste fue miembro de la Junta de Directores del Auxilio Mutuo, fungió como Presidente del Comité de Finanzas y colaboró en la orientación sobre la viabilidad de la construcción de la Torre y en la fase de publicación y proyección del proyecto. En lo pertinente, el ingeniero Ares declaró lo siguiente:

> P. Si iba a ocurrir una primera venta, o sea, por la Sociedad Española, de una oficina que tenía un uso asignado y la Sociedad Española interesaba cambiar el uso para vendérsela a un médico que le interesaba para otra especialidad, ¿cuál era el mecanismo?

R. Pues había que notificárselo a los condóminos treinta, sesenta o noventa días con antelación y si había oposición, pues había que ponderar la oposición esa para entonces cambiar el uso y sometérselo al Registro. Si no había problema de [sic]... con los condóminos, pues se podía someter al Registrador y el cambio, si había problemas, pues era una decisión del Auxilio venderla, cambiarle el uso o hacer otro tipo de negocio.

En cuanto a la carta que enviaba la SEAM para informarles a los titulares sobre las propuestas de cambio de uso, el ingeniero Ares indicó que las mismas no eran de cortesía sino que eran una obligación.[17] El ingeniero Ares indicó, además, que:

desde las últimas reuniones que tuve con la Junta y se me presentaron esos documentos para la aprobación ... se le explicó claramente a la junta que al asumir ese "mix" [de especialidades médico-dentales] ya final, era "the point of no return" en el sentido que estábamos encajonados a una condición de venta, que habían unas escapatorias, pero <u>era cuestión de hacerla[s] correctamente</u>. (Énfasis nuestro.)

Por otro lado, también testificó el doctor Manuel Miranda Ferrer, oftalmólogo de profesión. Éste fue el primer médico en opcionar una oficina en la Torre y quien ha fungido como Presidente de la Junta de Condóminos de la Torre, desde que se constituyó la Junta de Directores de

---

[17] De la transcripción surge lo siguiente: P. Cuando se fuera a intentar hacer un cambio por la Sociedad Española de Auxilio Mutuo y se cursaba por el señor Quiñoy esas cartas a los condóminos, según el criterio suyo, ¿son una mera cortesía o era un requisito legal? ... R. Yo no entiendo que sea de cortesía, esto es puro ... esto es puro negocio. O sea, yo tengo una obligación como síndico, como director de una institución tan grande que va más allá de la cortesía para mi.

la misma. En lo pertinente, el doctor Ferrer declaró lo

siguiente:

> P. Cuando ha habido una necesidad o deseo de cambiar el destino de una unidad, ¿cuál es el procedimiento que se ha seguido?
>
> R. El procedimiento que siempre se ha seguido fue que el hospital le escribía una carta a cada condómino diciéndole o especificándole que tal oficina con tal especialidad deseaba ser cambiada a tal otra especialidad y que si no había ninguna oposición en sesenta días, pues se daba por sentado el cambio.
>
> P. Okay. ¿Y si había oposición?
> R. <u>Si había oposición no se vendía a esa especialidad</u>.
>
> P. No, no se vendía. Dígale al Tribunal si en alguna ocasión, que usted conozca, se vendió la unidad a pesar de haber oposición de alguno de los médicos o de alguno de los condóminos.
>
> R. La única ocasión que sé es la que estamos actualmente. (Énfasis nuestro.)

Las declaraciones antes esbozadas, unidas a la propia

declaración del doctor Serrano a los efectos de que para

él los términos y condiciones de la escritura matriz

representaban "la seguridad de que estas oficinas tenían

un uso específico y que únicamente podría cambiarse con el

consentimiento de todos los condóminos", son razón

suficiente para concluir que no hubo --por parte de los

compradores de la Torre-- el <u>consentimiento informado e</u>

<u>inequívoco</u> requerido para que se entienda que éstos,

mediante las escrituras de compraventa, autorizaron a la

SEAM a cambiar el uso de las oficinas antes de la primera venta.

Además, los propios actos de la SEAM confirman lo aquí resuelto. Según surge del expediente y del testimonio del doctor Miranda Ferrer, la SEAM, luego de otorgarse la escritura matriz de la Torre, siempre se adhirió a un mismo proceso antes de llevar a cabo una compraventa que implicara un cambio de uso. La SEAM les enviaba a los titulares una carta notificándoles el cambio propuesto. En dicha carta les concedía a los titulares el término de 60 días para oponerse a la compraventa, apercibiéndoseles que de no recibirse objeciones escritas en dicho término la SEAM procedería a culminar el proceso de compraventa. De mediar objeción de alguno de los titulares, no se llevaba a cabo la compraventa.[18]

La SEAM aduce que optó por adherirse al proceso de notificación por deferencia a los condóminos y para procurar un ambiente de intercambio de ideas que promoviera la armonía entre todos los condóminos. No nos persuade. Sabido es que por disposición expresa del Artículo 1234 del Código Civil, 31 L.P.R.A. § 3472, al momento de juzgar la intención de las partes contratantes "deberá atenderse principalmente a los actos de éstos,

---

[18] De la prueba documental que obra en el expediente surge que para los cambios de uso propuestos para la oficina 803 y 813 medió objeción de los titulares y que la SEAM no culminó el proceso de compraventa de dichas oficinas.

coetáneos y posteriores al contrato". La fiel adhesión de la SEAM a dicho proceso no es más que un <u>acto posterior de reconocimiento</u> de que, mediante la escritura matriz, se estableció como requisito para un cambio de uso el consentimiento unánime posterior de los titulares de la Torre.

Por consiguiente, concluimos que para variar el uso de la oficina 518 se requería el consentimiento unánime posterior de los titulares del condominio.[19]

IV

Ahora bien, los peticionarios sostienen que, aun cuando se requiriese el consentimiento unánime posterior de los titulares, la objeción del doctor Serrano no es válida por ser contraria al principio general de la buena fe que rige en nuestro ordenamiento jurídico.[20] Sostienen

---

[19] Resulta pertinente señalar que no será necesario el consentimiento unánime posterior de los titulares de la Torre ante otras circunstancias establecidas en la cláusula vigésimo séptima de la escritura matriz, que clara y expresamente están eximidas de dicho consentimiento, como por ejemplo, cuando el cambio de uso es para una práctica de la profesión médico o dental no cubierta en la cláusula quinta de la escritura o si, el titular, en el futuro, continúa estudios subespecializados. Pues, por disposición expresa de la escritura matriz, dicha subespecialidad será incorporada para siempre en los usos de la oficina del titular.

[20] La nueva Ley de Condominios estableció, expresamente, en su Artículo 1-A que: "[e]n el ejercicio y reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho". A su vez, el Artículo 38-C (d), 31 L.P.R.A. § 1293b-3, de la nueva Ley

que el doctor Serrano no pudo ofrecer ninguna razón válida en derecho para su oposición a la variación de uso de la oficina 518. No les asiste la razón.

No podemos imputarle mala fe al doctor Serrano cuando éste fue la única parte que actuó conforme a lo plasmado en la escritura matriz de la Torre. Ante la falta de una reserva de variación de uso válida, clara y precisa a favor de la SEAM, el doctor Serrano no estaba obligado a aceptar el cambio de uso propuesto y, como titular, tenía el derecho a oponerse al mismo.

Tampoco podemos concluir que el doctor Serrano, al oponerse al cambio de uso propuesto, actuó movido por el mero capricho o la mala fe. No debemos olvidar que la propia SEAM, al proponerles a los titulares el cambio de uso de la oficina 518, expuso que la intención de los

---

de Condominios dispone que: "… [l]a oposición a un acuerdo que requiera unanimidad deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta". El requisito de fundamentar expresamente la oposición no aplica al presente caso debido a que el efecto retroactivo de la nueva Ley de Condominios no se extiende a situaciones en que, como en la presente, esté involucrado algún derecho adquirido de las partes. Véase, Consejo de Titulares v. Williams Hospitality Group, Inc., res. el 1 de junio de 2006, 2006 TSPR 94. Aquí, el doctor Serrano actuó bajo el estado de derecho anterior, en el cual no se requería fundamentar expresamente una oposición. Sin embargo, independientemente de que en la Ley de Condominios del 2003 se haya insertado expresamente que los titulares deben actuar conforme a los principios de la buena fe, dichos principios siempre han regido en todo nuestro ordenamiento jurídico y, por ende, aplican a la presente situación de hechos.

compradores era <u>expandir</u> la práctica de la Cardiología que ejercían en la oficina 516.

Al respecto, el doctor Serrano declaró en juicio que:

[s]e me hicieron unas representaciones de que estas ... digo, estas oficinas, licenciado, eran oficinas individuales, el cambiarle el uso a la oficina 518 a Cardiología, la convierte en una doble unidad de Cardiología y mayor número de cardiólogos, esto es claro y yo no puedo acomodar … yo no puedo acomodar tres cardiólogos en mi oficina … O sea, que es lógico que una vez aumente el espacio de trabajo y establece unas facilidades, usted puede tener mayor número de cardiólogos en esas facilidades.

De igual forma, la esposa del doctor Serrano declaró en juicio que:

[n]o es lo mismo tener una oficina con un solo médico que tener un espacio doble donde pueden tener las facilidades para tener un laboratorio de Cardiología completo. La competencia no es la misma si es un médico con un médico, que si es un mega grupo contra un médico… En esa oficina en un momento dado estaban practicando cuatro cardiólogos, ahora al retirarse uno de los doctores Lastra han vuelto a practicar tres cardiólogos. Pero ellos allí tienen todas las facilidades de Cardiología en un laboratorio completo."

Ciertamente, el deseo de proteger su práctica y, sobretodo, de evitar la posible competencia desleal que produciría la creación de una mega práctica de la especialidad de Cardiología en la Torre, <u>no son motivos matizados por la mala fe</u>. Al establecerse en la escritura matriz una distribución específica de especialidades por piso era <u>perfectamente legítimo</u>, de parte del doctor Serrano, esperar que las restricciones de uso le

protegerían de la creación de una mega práctica, sin su consentimiento; más cuando el doctor Serrano siempre entendió que su consentimiento era necesario para que se aprobara un cambio de uso.

En todo caso, la mala fe le es imputable a la SEAM, quien, con conocimiento de las restricciones de uso, procedió a suscribir un contrato de promesa de compraventa en el cual se certificaba falsamente que la oficina 518 estaba destinada en la escritura matriz a la práctica de la Cardiología, y quien, con conocimiento de la oposición del doctor Serrano, procedió a vender la oficina 518 para la práctica de la Cardiología, sin informarles a los compradores que medió oposición de los titulares.[21]

Resolver lo contrario sería premiar a quien ha actuado de forma contraria al principio general de la buena fe y castigar al que reclama los derechos adquiridos como consecuencia de lo expresamente pactado por las partes.

---

[21] El doctor Redondo Díaz y su esposa alegaron en su contestación a la demanda que la SEAM les afirmó que no medió oposición de los titulares. Por su parte, el doctor Serrano declaró en juicio que le constaba que los esposos Redondo no tenían conocimiento de su oposición. El Tribunal de Primera Instancia adoptó lo declarado por el doctor Serrano como una determinación de hecho y hasta la propia SEAM utiliza el desconocimiento de los esposos Redondo Díaz para establecer la buena fe de estos últimos al momento de adquirir la oficina 518.

V

Como tercer señalamiento de error, los peticionarios aducen que aunque fuese necesario el consentimiento unánime posterior de los titulares y aunque la objeción del doctor Serrano fuese válida, los esposos Redondo Díaz se encuentran protegidos por la tercería registral. Sostienen que al adquirir la oficina 518 los esposos Redondo Díaz confiaron en que de la escritura matriz y, por ende, del Registro, surgía la facultad de la SEAM para variar el uso de la oficina 518. <u>Tampoco les asiste la razón</u>.

El Artículo 105 de la Ley Hipotecaria, 30 L.P.R.A. § 2355, establece, en lo pertinente que:

> [a] pesar que la inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes, ni altera las relaciones jurídicas de quienes intervengan como partes en dichos actos o contratos, el tercero que de buena fe y a título oneroso adquiera válidamente algún derecho de persona que en el Registro aparezca con facultad para transmitirlo será mantenido en su adquisición, una vez haya inscrito su derecho, **cuando por cualquier razón resulte inexacto el Registro**, bien sea que se rescinda, resuelva o anule el título del otorgante en virtud de causas que no resulten clara y expresamente del propio Registro, o que existan sobre la finca acciones o títulos de dominio o de otros derechos reales que no estén debidamente inscritos.(Énfasis nuestro.)

<u>La normativa aplicable es clara</u>. Para que advenga en aplicación la protección de la tercería registral es <u>indispensable</u> que la información que surja del registro sea inexacta. En el presente caso, <u>no</u> estamos ante un

registro inexacto. Del registro surgía con exactitud que la oficina 518 se encontraba destinada a la práctica de la Otorrinolaringología y que, conforme a lo antes resuelto, la SEAM no estaba facultada a variar el cambio de uso sin el consentimiento unánime posterior de los titulares. Ello impide que los esposos Redondo reclamen la protección de la tercería registral.[22]

VI

En su cuarto señalamiento de error, los peticionarios aducen que el Tribunal de Apelaciones incidió al dejar sin efecto la imposición de sanciones por temeridad en contra del doctor Serrano y su esposa. Aun cuando la imposición de sanciones por temeridad procede <u>únicamente</u> contra una parte perdidosa y que, <u>en virtud de lo antes resuelto</u>, el doctor Serrano y su esposa no pueden ser considerados como parte perdidosa, procedemos a atender brevemente el error señalado y resolvemos que el tribunal apelativo intermedio no erró al respecto. Veamos.

En el presente caso, el matrimonio Serrano incluyó a los doctores Rafael y Jorge Lastra como partes demandadas, principalmente, porque de concederse el remedio solicitado, éstos tendrían que desalojar la oficina 518. No obstante, el Tribunal de Primera Instancia entendió que

---

[22] Lo antes resuelto no significa que los esposos Redondo estén impedidos de reclamarle a la SEAM cualquier remedio que en derecho proceda.

el doctor Serrano y su esposa fueron temerarios al incluir a los doctores Lastra en el pleito, debido a que no presentaron prueba que vinculara a estos doctores con la compraventa u ocupación de la oficina 518.

Aunque es cierto que los doctores Lastra no comparecieron como compradores en la escritura de compraventa de la oficina 518, no podemos avalar la determinación del Tribunal de Primera Instancia al respecto. Ello debido a que el doctor Serrano tuvo razones suficientes para incluir y mantener a los doctores Lastra como partes demandadas en el pleito.

En primer término, la inclusión de los doctores Lastra en la demanda se debió a que la propia SEAM les indicó a los titulares mediante carta que los doctores Lastra estaban interesados en adquirir la oficina 518 para expandir la práctica que hasta el momento ejercían en la oficina 516.

En segundo término, los propios peticionarios --entiéndase, los doctores Lastra y el doctor Redondo Díaz-- aceptaron, mediante sus respectivas contestaciones a la demanda, que la oficina 518 es un anejo de la oficina 516, que practicaban la Cardiología en la oficina 518 y que cuando el doctor Redondo compró la oficina 518 lo hizo para expandir la oficina 516.[23]

---

[23] Específicamente, los doctores Lastra adujeron en su contestación a la demanda que la ocupación de la oficina 518, por ser un anejo de la oficina 516, no establece una

Indudablemente, todo lo antes expuesto, constituyó justificación suficiente para que el doctor Serrano haya incluido y mantenido a los doctores Lastra como partes demandadas en el pleito, pues, de concederse el remedio solicitado, la práctica que hasta el momento éstos ejercían, de alguna forma u otra, resulta afectada.

VII

Por último, los peticionarios aducen que el Tribunal de Apelaciones erró al no darle deferencia a la apreciación de la prueba y las determinaciones de hecho del Tribunal de Primera Instancia. Tampoco les asiste la razón en dicho señalamiento.

Como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad de sustituir por sus propias apreciaciones, las determinaciones del foro de instancia. Rolón v. Charlie Car Rental, 148 D.P.R. 420 (1999).

La normativa antes expuesta no es absoluta. Ésta cede si puede establecerse que en las determinaciones del

---

oficina adicional de Cardiología. Por su parte, el doctor Redondo, en su contestación a la demanda, aceptó que tanto él como los doctores Lastra practicaban la Cardiología en la oficina 518, y que cuando compró la oficina 518 lo hizo para expandir la oficina 516.

Tribunal de Primera Instancia medió pasión, prejuicio, parcialidad o error manifiesto. Álvarez de Choudens v. Rivera Vázquez, res. el 17 de junio de 2005, 2005 TSPR 85.

En el presente caso, el Tribunal de Primera Instancia determinó, en base a la prueba presentada, que la SEAM estableció una reserva válida a su favor y que dicha reserva surgía de forma clara y precisa de la escritura matriz de la Torre.

Ello, de por sí, constituye justificación suficiente para que tanto el Tribunal de Apelaciones como este Tribunal intervengamos con la apreciación de la prueba y las determinaciones de hecho del Tribunal de Primera Instancia. De lo contrario, estaríamos avalando un error manifiesto por parte del foro de instancia, en clara contradicción a la norma de claridad y precisión establecida por este Tribunal desde el 1991 en Consejo Tit. C. Parkside v. MGIC Fin. Corp., ante.

VII

En mérito de lo antes expuesto, procede confirmar la Sentencia emitida por el Tribunal de Apelaciones, mediante la cual se expidió un *injunction*, prohibiéndole a los demandados utilizar la oficina 518 para algún uso diferente a la práctica de la Otorrinolaringología y devolver el caso al foro de instancia para que se celebre una vista para determinar la existencia y valoración de los daños reclamados por el doctor Serrano y su esposa.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LÓPEZ

Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dr. José Alfonso Serrano
Muñoz, su esposa María Rosa
Freiría Mendía y la Sociedad
de Gananciales constituida
por ambos

     Recurrido

|  |  |  |
|---|---|---|
| | CC-2005-888 | *CERTIORARI* |
| vs. | | |
| | CC-2005-903 | |
| | CC-2005-904 | |

Sociedad Española de Auxilio
Mutuo y Beneficencia de
Puerto Rico (Hospital Auxilio
Mutuo) y otros

     Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 26 de junio de 2007

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones, mediante la cual se expidió un *injunction*, prohibiéndole a los demandados utilizar la oficina 518 para algún uso diferente a la práctica de la Otorrinolaringología y se devuelve el caso al foro de instancia para que celebre una vista para determinar la existencia y valoración de los daños reclamados por el Dr. José Alfonso Serrano y su esposa.

Así lo pronunció, manda el Tribunal y certifica al Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton "concurre con la Opinión del Tribunal por entender que en este caso la Cláusula Vigésimo Séptima no contiene una reserva que le permitiera a la Sociedad Española de Auxilio Mutuo variar el uso asignado sin antes obtener el consentimiento unánime de todos los titulares. Por ende, como el Dr. José Alfonso Serrano Muñoz expresó su oposición a la variación de uso de una de las oficinas del condominio, y no habiendo sido enmendada la Cláusula Quinta de la escritura matriz, dicho local tenía que ser destinado para el ejercicio de la especialidad de Otorrinolaringología." La Juez

Asociada señora Rodríguez Rodríguez emitió Opinión disidente. El Juez Asociado señor Fuster Berlingeri no intervino.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. José Alfonso Serrano Muñoz, su esposa María Rosa Freiría Mandía y la Sociedad de Gananciales constituida por ambos<br><br>        Recurrida<br><br>                v.<br><br>Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, (Hospital Auxilio Mutuo); Dr. Pedro R. Redondo Díaz y su esposa Cynthia Elizabeth Rivera; Dr. Rafael Lastra Hernández y Dr. Jorge Lastra Inserni<br><br>        Peticionarios | CC-2005-888<br> Cons. con<br>CC-2005-903<br>CC-2005-904 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 26 de junio 2007

Los recursos de epígrafe nos brindan la oportunidad de examinar dos controversias relacionadas con el régimen de propiedad horizontal. Primero, ¿hasta qué punto son ilícitas las reservas o condiciones diseñadas para variar el uso asignado a los apartamientos en la escritura matriz del condominio? Segundo, ¿hasta qué punto constituye un principio general del derecho la norma pautada en el artículo 38-C(d) de la Ley de Condominios, que proscribe la oposición infundada a los acuerdos del Consejo de Titulares sujetos al requisito de unanimidad?

La respuesta que ofrece la mayoría a estas interrogantes nos parece incorrecta por lo cual disiento del curso de acción pautado.

I.

La Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico ("SEAM") edificó una torre de oficinas médicas en un terreno cercano al Hospital Auxilio Mutuo ("Hospital"). El propósito era vender las oficinas a los profesionales de la salud que interesaran establecer allí sus prácticas privadas, lo cual incrementaría la demanda de los servicios ambulatorios que ofrece el Hospital. *Sentencia* del Tribunal de Primera Instancia ("Sentencia TPI"), Apéndice de la *Petición de Certiorari* presentada por la SEAM ("Apéndice I"), págs. 955-956.

Antes de someter el inmueble al régimen de propiedad horizontal, la SEAM otorgó opciones de compraventa sobre la mayoría de las oficinas. Así, el Dr. José Alfonso Serrano Muñoz opcionó la oficina 702, asignada a la cardiología, el 15 de mayo de 1996. Sentencia TPI, *supra*, pág. 957; *Contrato de Opción de Compra Sobre Propiedad Horizontal*, Apéndice I, págs. 536-543.

La torre quedó sometida al régimen de propiedad horizontal mediante la escritura número dos otorgada el 1 de mayo de 2000 ante el notario Luis Oscar Ramos Hernández ("Escritura Matriz").[24] Dicho instrumento disponía que cada

---

[24] Los autos sugieren que dicha Escritura fue enmendada mediante las escrituras número tres y cinco del mismo notario, otorgadas el 30 de mayo y 27 de septiembre de 2000, y que las mismas constan presentadas en los Asientos 104 y 132 del Libro Diario 983 de Río Piedras Norte, Sección Segunda del Registro de la Propiedad de San Juan. Véase: escritura número 158 otorgada ante el notario Francisco M. Vázquez Santoni el 18 de abril de 2001 y escritura número 530

oficina se dedicaría a determinada área de la medicina.[25]  No obstante, permitía que se variara el uso de las oficinas mediante el consentimiento unánime de los condominos o, dadas las circunstancias que luego examinaremos, mediante la decisión unilateral del titular.[26]  Sentencia TPI, *supra*, págs. 957-958; Escritura Matriz, Apéndice I, págs. 584-743.

La SEAM vendió y entregó la Oficina 702 al Dr. Serrano Muñoz y a su esposa, María Rosa Freiría Mendía, mediante la escritura número 158 otorgada ante el notario Francisco M. Vázquez Santoni el 18 de abril de 2001 ("escritura 158"). Era ésta una de quince oficinas dedicadas a la cardiología en la Escritura Matriz.[27]  Sentencia TPI, *supra*, págs. 955 y 958; Escritura 158, Apéndice I, págs. 764-778; Escritura Matriz, *supra*, págs. 617-619.

Durante los próximos meses, hubo modificaciones al uso de varias oficinas antes de su primera venta.  Ello ocurría del siguiente modo.  La SEAM enviaba una carta a los titulares mediante la cual notificaba el cambio pretendido y les solicitaba que, de tener alguna objeción, la comunicaran

---

otorgada el 30 de septiembre de 2002 ante la notario Adela Surillo Gutiérrez, Apéndice I, págs. 768 y 795.  No están en controversia estos asuntos.

[25] La SEAM se reservó la titularidad del estacionamiento y de los pisos primero y tercero, estos para ubicar establecimientos comerciales y de servicios médico-hospitalario.  Escritura Matriz, Apéndice I, pág. 616.

[26] Existe un Reglamento para la Administración del Condominio Torre del Auxilio Mutuo.  No discutiremos sus disposiciones por entender que dejan de hacer una aportación significativa a nuestro análisis sobre el contenido de la Escritura Matriz.

[27] La cifra incluye una oficina dedicada a la cardiología pediátrica.

por escrito en determinado plazo, pues de otro modo se efectuaría el cambio y la correspondiente compraventa. Todos los cambios ocurrieron sin objeción de los titulares, y la SEAM desistió de al menos un cambio objetado.[28]

Así las cosas, el 18 de abril de 2002 la SEAM otorgó un contrato de promesa de compraventa con los doctores Pedro Redondo Díaz y Rafael Lastra Hernández. Estos se comprometieron a comprar, y la SEAM a vender, la oficina 518. Dicha unidad se dedicaría a la cardiología. *Contrato de Promesa de Compraventa sobre Propiedad Horizontal*, Apéndice I, págs. 779-782.

El uso asignado a la oficina 518, sin embargo, era el de otorrinolaringología. De ahí que el 18 de junio de 2002 la SEAM notificó a los titulares su intención de vender la oficina 518 a los cardiólogos Redondo Díaz, Lastra Hernández y Jorge Lastra Inserni.[29] Se indicó que estos eran titulares de la oficina 516[30] y deseaban "expandir la práctica que actualmente tienen", lo cual suponía "cambios internos que no

---

[28] Este párrafo se ampara principalmente en el testimonio incontrovertido del Dr. Manuel Miranda Ferrer, hasta entonces el único presidente de la Junta de Directores del Condominio. Éste describió brevemente el procedimiento de consulta y añadió que "si había oposición no se vendía a esa especialidad." *Transcripción de la Vista en su Fondo de 1 de marzo de* 2004, Apéndice I, págs. 423-424.

[29] La sentencia del foro primario determinó que la SEAM envió una carta a los titulares, suscrita por el Sr. Quiñoy, "en la que anunciaba que se proponía venderle la oficina 518 a los codemandados doctores Lastra y Redondo..." El texto de la carta aclara que se mencionó a ambos doctores Lastra como posibles compradores.

[30] Sin embargo, ni el Dr. Redondo Díaz ni su cónyuge, Cynthia Elizabeth Rivera, eran titulares de la oficina 516. Sentencia TPI, *supra*, pág. 955.

afectan el número de oficinas por especialidad en el Condominio Torre de Auxilio Mutuo." Carta del Sr. Joaquín Quiñoy[31] al Dr. Serrano Muñoz de 18 de junio de 2002, Apéndice I, pág. 784; Sentencia TPI, *supra*, págs. 958-959.

El Dr. Serrano Muñoz se opuso al cambio de uso mediante una carta dirigida al Sr. Quiñoy dentro del plazo de 60 días concedido. Vale la pena destacar que durante este intercambio epistolario, había once oficinas dedicadas a la cardiología.[32] Sentencia TPI, *supra*, pág. 959; Carta del Dr. Serrano Muñoz al Sr. Quiñoy de 20 de junio de 2002, Apéndice I, pág. 785.

Esta vez la SEAM desatendió la oposición del titular y procedió con el cambio de uso y enajenación. El Dr. Redondo Díaz y su esposa, Cynthia Elizabeth Rivera, adquirieron la oficina 518 mediante la escritura número 530 otorgada el 30 de septiembre de 2002 ante la notario Adela Surillo Gutiérrez ("escritura 530"). Sentencia TPI, *supra*, pags. 955 y 959; escritura 530, Apéndice I, págs. 790-807.

El 6 de junio de 2003, el Dr. Serrano Muñoz, la Sra. Freiría Mendía y la sociedad legal de gananciales Serrano-Freiría ("demandantes-recurridos") demandaron a la SEAM, a

---

[31] Surge de esta misiva que el Sr. Quiñoy se desempañaba como Presidente de la Comisión de Administración de la SEAM.

[32] La sentencia del foro primario determinó que, "[a] la fecha en que se ofreció por primera vez en venta la oficina 518, sólo existían 11 oficinas de cardiología, de las 15 enumeradas en la Escritura Matriz." Nada sugiere que la cifra haya variado al efectuarse las referidas comunicaciones entre el Sr. Quiñoy y el Dr. Serrano Muñoz. Por otro lado, los demandantes-recurridos no han cuestionado que dicha cifra incluye una oficina dedicada a la cardiología pediátrica.

los esposos Redondo-Rivera, y a los doctores Lastra Hernández y Lastra Inserni ("peticionarios"). Alegaron, principalmente, que el cambio de uso de la oficina 518 era contrario a la Escritura Matriz y que la SEAM recibió su carta objetando el cambio antes de expirar el plazo concedido para ello. Solicitaron un interdicto permanente mediante el cual se prohibiera a los demandados cualquier uso de la oficina 518, excepto el de otorrinolaringología. También solicitaron la indemnización de sus daños, valorados en $500,000, y la imposición de costas, intereses y honorarios de abogado sobre los demandados. *Demanda*, Apéndice I, págs. 1-7.

Todos los demandados contestaron. Negaron las alegaciones sustantivas de los peticionarios y levantaron defensas afirmativas. Entre sus defensas, la SEAM adujo que los usos especificados en la Escritura Matriz son vinculantes sólo después de la primera venta de la unidad en cuestión, y que el número de oficinas dedicadas a la cardiología era igual o menor al contemplado en la Escritura Matriz. Los esposos Redondo alegaron que desconocían la oposición de los peticionarios, que no hubieran comprado la oficina 518 de otro modo, y que procedieron al amparo de la Escritura Matriz y las expresiones de la SEAM, quien les indicó que no había oposición a la compraventa. También alegaron que el cambio de uso no variaba el número de oficinas dedicadas a la cardiología ni representaba un aumento de la competencia contra los demandantes. Véase las tres *Contestación a*

*Demanda*, Apéndice I, págs. 8-19.

Tras múltiples sucesos procesales, el foro primario celebró la vista en su fondo. Los demandantes presentaron su prueba y los demandados sometieron el caso sin presentar la suya.[33] Luego se dictó una sentencia desestimando la demanda.[34] Resolvió el tribunal que los usos especificados en la Escritura Matriz son vinculantes sólo después de la primera venta de la unidad en cuestión, dada la intención de las partes y los términos claros de la Escritura y de los contratos de compraventa. Citando a *Condominio Profesional San Juan Health Centre v. PRF, Inc.*, 133 D.P.R. 488 (1993), explicó que tal acuerdo es ilícito sólo cuando se trata de un condominio comercial o profesional donde los titulares tienen una garantía de exclusividad, circunstancia que no existe en el Condominio Torre de Auxilio Mutuo.

Independientemente de si hubo una reserva lícita con respecto al cambio de uso, el foro sentenciador concluyó que procedía desestimar la demanda, pues la restricción de uso es inoponible a la SEAM y a los esposos Redondo. En cuanto a la SEAM, destacó el Tribunal que, según *Soto Vázquez v. Vázquez Torres*, 138 D.P.R. 282 (1995), tales restricciones en los

---

[33] Antes de someter el caso, los demandados solicitaron la desestimación de la demanda al amparo de la Regla 39.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La cuestión se resolvió en su contra mediante un proceso que incluyó la intervención del Tribunal de Apelaciones y de este Foro, sin que se adjudicaran las controversias aquí presentadas.

[34] También se ordenó que los demandantes-recurridos pagaran las costas de cada demandado, así como $1,000, por temeridad, a los demandados Lastra Hernández y Lastra Iserni conjuntamente.

condominios profesionales deben ser sumamente claras, condición incumplida en el caso de autos. Con respecto a los esposos Redondo, el Tribunal resolvió que les cobija la tercería registral. También ordenó que los demandantes pagaran las costas de cada demandado y $1,000 a los doctores Lastra, conjuntamente, por temeridad. Sentencia TPI, *supra*, págs. 951-971.

Los demandantes-recurridos apelaron la susodicha sentencia oportunamente al Tribunal de Apelaciones. Éste revocó.[35] Comenzó por descartar la apreciación fáctica del foro primario e interpretar que la Escritura Matriz no faculta a la SEAM para variar el uso de las unidades antes de su primera venta. Enfatizó que toda la prueba testifical apoya esa interpretación, así como el contrato de opción de los demandantes, el cual les garantizó que no se cambiarían los usos de las demás oficinas en detrimento de su propiedad ni del edificio.

El foro *a quo* añadió que la SEAM no podía reservarse la facultad de variar unilateralmente el uso de las unidades. Su razonamiento fue como sigue. El derecho aplicable surge principalmente de la Ley de Propiedad Horizontal de 1958, Ley Núm. 104 de 25 de junio de 1958, ("ley Núm. 104"), según enmendada, pero sin incluir las enmiendas que constituyen la nueva Ley de Condominios. Aquella ley exigía que la

---

[35] Específicamente, el Tribunal concedió el *injunction* permanente solicitado, revocó la determinación de temeridad por haberse demandado a los doctores Lastra, y devolvió el caso al Tribunal de Primera Instancia para que atendiera la cuestión de los daños.

escritura matriz del condominio especificara el uso de cada unidad, uso que podría variarse sólo con el consentimiento unánime de los titulares. Ello prohibía toda reserva del derecho de cambiar un uso sin el consentimiento unánime de los condóminos, según *Condominio Profesional San Juan Health Centre v. PRF, Inc.*, *supra*. Por último, el Tribunal de Apelaciones concluyó, *inter alia*,[36] que los esposos Redondo no gozan de la tercería registral.[37]

Los peticionarios acuden oportunamente ante nosotros mediante una trinidad de recursos. Imputan error al resolverse, en síntesis: (1) que son ilícitas las reservas del derecho de variar el uso de un apartamiento, cuando éstas se incluyen en las escrituras matriz y de compraventa; (2) que no se configuró tal reserva en este caso; (3) que no procedieron de mala fe los demandantes-recurridos al rechazar el cambio de uso bajo consideración; (4) que no son terceros registrales los esposos Redondo-Rivera; y (5) que no fueron temerarios los demandantes-recurridos por demandar y mantener

_____

[36] El Tribunal de Apelaciones no discutió la interpretación y aplicación de *Soto Vázquez v. Vázquez Torres*, 138 D.P.R. 282 (1995), que hizo el foro primario. Con respecto a la determinación de temeridad, el tribunal apelativo destacó los siguientes hechos: la carta mediante la cual se informó el cambio de uso mencionó como posibles compradores a los doctores Lastra Hernández y Lastra Iserni, el Dr. Lastra Hernández participó activamente en la gestión del negocio, y los demandantes desconocían la titularidad de la oficina 518.

[37] Explicó que dicha protección aplica cuando el tercero ha confiado en un registro inexacto. Al efectuarse los negocios jurídicos pertinentes, surgía del registro que la oficina 518 estaba dedicada a la otorrinolaringología. Por ende, el Registro era exacto.

en el pleito a los doctores Lastra.[38]  Consolidamos las tres

---

[38] Mediante el recurso CC-2005-888 comparece la SEAM y señala los siguientes errores:

> Primer Error.  Cometió error el T de A al descartar la norma establecida en Parkside que permite reservas a favor del desarrollador para cambios de uso de áreas en los condominios, siempre que éstas consten en la escritura matriz y en todas las de compraventa.

> Segundo Error.  El T de A comete error al sustituir sin base en derecho la apreciación de la prueba que hizo el TPI sobre el contenido claro de la reserva o escapatoria, habida cuenta de que las conclusiones de instancia se formularon sobre la base, no sólo del texto de la cláusula que autorizaba los cambios de usos sin necesidad de obtener el consentimiento unánime, sino a base de las propias alegaciones y de los testimonios ofrecidos por la parte demandante en el juicio y creidos por el juzgador de los hechos.

> Tercer Error.  El T de A cometió error al descartar la apreciación de la prueba oral que hizo el TPI respecto a la intención que tuvieron las partes contratantes, sustituyendo así su propia apreciación sin que mediara pasión, prejuicio o parcialidad de parte del TPI y sin que la apreciación del foro de instancia representara un grave error o una injusticia.

> Cuarto error.  Cometió error el T de A al negarle a los codemandados esposos Redondo-Rivera el carácter de terceros registrales, protegidos en su adquisición de una oficina para cardiología.

> Quinto error.  El T de A cometió error al no considerar que la oposición del demandante al cambio de uso de la oficina carecía de fundamento alguno y violentó la buena fe contractual.

Mediante el recurso CC-2005-904 comparecen los esposos Redondo-Rivera, quienes apuntan los siguientes errores:

> **Primer error:**  Erró el Tribunal de Apelaciones al concluir que los esposos Redondo no son terceros registrales.

> **Segundo error:**  Erró el Tribunal de Apelaciones al sustituir la apreciación de la prueba que hizo el tribunal de instancia.

Mediante el recurso CC-2005-903 comparecen los doctores Lastra Hernández y Lastra Iserni, quienes señalan los siguientes errores:

peticiones de *certiorari* y expedimos los autos solicitados mediante nuestra *Resolución* de 27 de enero de 2006. Al cabo de varios trámites procesales, las partes comparecieron y el caso quedó sometido.

## II.

La controversia de marras se refiere a la interpretación, validez y exigibilidad de ciertas disposiciones contenidas en la Escritura Matriz del Condominio Torre de Auxilio Mutuo. Conviene reproducir detalladamente las mismas.

Los usos de las distintas áreas del Condominio se establecen en el párrafo 5 de la Escritura Matriz. Éste dispone, en lo pertinente:

La Sociedad Española de Auxilio Mutuo y

---

**Primer error**: ¿Puede un desarrollador de un inmueble sometido al régimen de propiedad horizontal hacer reserva en la escritura matriz para variar durante la fase de individualización y primeras ventas la especialidad de ciertas oficinas médicas?

**Segundo error**: Exige la cláusula 27 de la escritura matriz de la Torre Auxilio Mutuo el consentimiento unánime de los condóminos para cambiar la especialidad de una oficina antes de la individualización y primera venta?

**Tercer error**: ¿Son los esposos Redondo terceros registrales? ¿A quién corresponde presentar prueba sobre mala fe, si en nuestro ordenamiento jurídico la buena fe se presume?

**Cuarto error**: ¿Puede un tribunal apelativo sustituir la apreciación de la prueba y las determinaciones de hechos que hizo el TPI, en ausencia de error, pasión, prejuicio o parcialidad?

**Quinto error**: ¿Actua con temeridad un demandante cuando incluye a un demandado en un pleito y lo mantiene hasta el juicio sin tener ni un ápice de prueba en su contra?

Beneficencia de Puerto Rico, Inc. ha decidido construir en una parcela de su propiedad descrita en el inciso PRIMERO de esta escritura, el edificio en Condominio TORRE DEL AUXILIO MUTUO para uso exclusivo de oficinas médico-dentales a ser vendidas a profesionales de la salud de la Facultad Médica del Hospital Auxilio Mutuo y reteniendo y operando para sí las áreas comerciales y/o de servicios médicos-hospitalarios de los Pisos Uno y Tres para dedicarlos a, entre otros, laboratorios clínicos, unidad de endoscopia, radiología e imágenes, farmacia, banco, cafetería y otros. Todo esto con el propósito fundamental de fortalecer y ampliar los servicios ambulatorios que ofrece actualmente dicho Hospital a sus socios y a la población en general. Por ello se destinan todas las oficinas del Edificio para ser usadas exclusivamente como oficinas de profesionales relacionados con la salud, con excepción del Primer Piso y el Tercer Piso que los retendrá para si la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. para dedicarlos a usos comerciales y/o de servicios médico-hospitalarios y usos accesorios a éstos. **A continuación se enumeran todas y cada una de las oficinas del Edificio y las áreas de los pisos Uno y Tres por sus usos a los cuáles serán dedicadas:**

. . .

La oficina 518 quedó asignada al uso de otorrinolaringología. Apéndice I, págs. 616-619.

El párrafo 27 también atiende extensamente los usos de las oficinas. Reza así su inciso (a):

Habiéndose construido este Edificio esencialmente para médicos, dentistas y profesionales de la salud, en cumplimiento con la Ley de Propiedad Horizontal de Puerto Rico, según enmendada, **se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina**, según el listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO. **En el futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador que adquiera el título de la unidad u oficina o su sucesor, arrendatario o cesionario, usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura.** Solamente se podrá variar el uso o los usos específicos a los

que se destinó la unidad u oficina:

(1) cuando sea para una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura; (2) cuando el titular de la unidad previamente requiera y obtenga el consentimiento unánime por escrito de los condómines [sic], según dispuesto en el ordenamiento legal vigente, para variar el uso o los usos señalados en la Cláusula QUINTO para la unidad u oficina.

El esquema establecido en el párrafo 27(b) para la venta de oficinas también incide sobre el uso de éstas:

Cuando se fuere a traspasar la titularidad por cualquier forma, se debe seguir el estricto orden:

1. El titular o sus herederos tasarán la propiedad a través de un profesional acreditado para ello.

2. Notificarán por correo certificado con acuse de recibo a la Administración del Condominio con el precio de venta según tasación que se acompaña.

3. La Administración notificará inmediatamente al Consejo de Titulares y a todas las partes interesadas de la oferta de venta y quienes a su vez tendrán sesenta (60) días a partir de la fecha de la notificación de la Administración para contestar por escrito a éstos [sic] su aceptación de comprar la oficina por el precio tasado.

4. Tendrán preferencia en la compra de la oficina en el siguiente orden:

   a. Los titulares de la misma práctica profesional para dedicarla al mismo uso del que la adquiere.

   b. En su ausencia los demás titulares para dedicarla al uso al cual ellos dedican la suya en el Condominio.

   c. En su ausencia la Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico Inc., quien es también titular para dedicarla al uso para el cual el vendedor la utilizaba.

    d. En su ausencia cualquier profesional de la Facultad Médica del Hospital Auxilio Mutuo para dedicarla al uso para el cual está acreditado el comprador a ejercer su profesión.

    e. ...

    f. En su ausencia después de transcurrir los sesenta (60) días del aviso de la Administración, sin recibirse contestación de los interesados, podrá vender el titular o sus herederos, por el precio que estimen razonable, a cualquier profesional de la salud acreditado en el país para ejercer su práctica profesional en el campo médico-dental.

El párrafo 27(e) establece, a su vez, que un titular podrá incorporar permanentemente al uso de su oficina aquella subespecialidad cuya futura práctica se le autorice mediante la debida preparación académica y aprobación gubernamental. Apéndice I, págs. 735-738.

Por otro lado, sendas cláusulas de la Escritura Matriz exigen el estricto cumplimiento con las normas del Condominio,[39] y las escrituras 158 y 530 contienen un texto similar al párrafo 27 de la Escritura Matriz. Apéndice I, págs. 773-776, 800-805.

**III.**

Los recursos de epígrafe presentan cuatro preguntas

---

[39] La Cláusula Décimo Sexta establece que "cada titular" acatará las disposiciones de la Escritura Matriz, el Reglamento y los dictámenes del Consejo de Titulares. Lo contrario justificará una acción de *injunction*, daños u otro remedio legal procedente. De otra parte, la Cláusula Vigésimo Octava establece que, "sin excepción alguna", todo titular está obligado a cumplir con las disposiciones de la Escritura y del Reglamento. Añade que todo adquirente u ocupante de una unidad "acepta sin reservas las disposiciones recogidas en esta escritura, conllevando ello la retificación de la misma en todas sus partes."

medulares. ¿Cuál es la ley aplicable a este caso? Según dicha ley, ¿hubo una restricción de uso con respecto a la oficina 518? Si la hubo, ¿existe una reserva lícita del derecho de variar tal uso? Si no existe, ¿procedieron con mala fe los demandantes-recurridos al objetar el cambio de uso propuesto para la oficina 518? Emprendemos el análisis de la normativa jurídica, comenzando, en esta sección, con la interrogante sobre cuál es la ley aplicable.

**A.**

Érase una vez la Ley de Propiedad Horizontal,[40] Ley Núm. 104 de 25 de junio de 1958 ("Ley 104"). Ésta fue objeto de varias enmiendas a través de los años, hasta que se aprobó la Ley Núm. 103 de 5 de abril de 2003 ("Ley 103"), cuyas disposiciones modificaron sustancialmente la Ley de Propiedad Horizontal y la denominaron "Ley de Condominios". El nuevo estatuto entró en vigor 90 días a partir de su aprobación, es decir, el 4 de julio de 2003. Aplica a todo inmueble sometido al régimen de propiedad horizontal, "cualquiera que sea el momento en que fuera sometido a dicho régimen." Arts. 1 y 44, Ley 103.[41] **Ello significa que la Ley 103 tiene efecto retroactivo.** *Consejo de Titulares v. Williams Hospitality Group*, res. 1 de junio de 2006, 168 D.P.R. ___, 2006 T.S.P.R. 94.

Claro está, la retroactividad de la Ley 103 no debe

_____

[40] Esta denominación es una abreviación común del título correcto, "Ley de la Propiedad Horizontal". Véase el artículo 1 de la Ley 104, recogido en el "Historial" de 31 L.P.R.A. § 1291 (2003).

[41] Véase el "Historial" de 31 L.P.R.A. § 1291.

menoscabar los derechos adquiridos bajo una legislación anterior, dado el Artículo 3 de nuestro Código Civil, 31 L.P.R.A. § 3. Así lo entendimos en *Consejo de Titulares v. Williams Hospitality Group*, *supra*, donde tuvimos la oportunidad de examinar el concepto 'derecho adquirido':

> ...el derecho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejerciesen, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar. El derecho adquirido, en cambio, es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior. Así, los tratadistas distinguen entre la mera expectativa del derecho y los derechos adquiridos que ya entraron en el patrimonio de los sujetos involucrados.

*Supra* (cita omitida). Surge de nuestra Opinión en *Williams Hospitality Group*, por ejemplo, que la adquisición del dominio al palio de la ley anterior es un derecho adquirido, más no las facultades constitutivas de ese derecho. Igualmente, una decisión del Consejo de Titulares aprobada antes de entrar en vigor la Ley 103 resulta inmune al planteamiento de que su aprobación incumplió los nuevos requisitos procesales, así como la derrota de una propuesta resulta inmune al planteamiento de que se cumplieron esos requisitos.

Podemos concluir, entonces, que la Ley de Condominios aplica prospectiva y retroactivamente a todos los inmuebles sometidos al régimen de propiedad horizontal. La antigua Ley de Propiedad Horizontal es aplicable, a modo de excepción, sólo en cuanto la controversia trabada derive de hechos acaecidos durante su vigencia y que configuren un derecho

adquirido.  La Opinión mayoritaria concluye, sin más, que aplica a esta controversia la Ley Núm. 104 por ser "la ley vigente al momento de los hechos", (Énfasis en original), obviando el lenguaje expreso de la Ley 103 en el sentido que ésta aplica a todo inmueble sometido al régimen de propiedad horizontal, "cualquiera que sea el momento en que fuera sometido a dicho régimen."  Arts. 1, 44 de Ley 103.  Es decir, que la Ley 103 tiene efecto retroactivo.  Además, la Opinión mayoritaria descarta el análisis que sobre este particular que hicimos recientemente en *Consejo de Titulares v. Williams Hospitality Group*, res. 1ero. de junio de 2006, 168 D.P.R. ___, 2006 T.S.P.R. 94.  En este sentido, la conclusión de la Mayoría es en todo punto incompatible con nuestro recién dictamen en *Williams* Hospitality Group*, supra.*[42]

### B.

Veamos ahora como han variado los preceptos pertinentes de nuestra legislación.  La Ley de Condominios contiene sus principales disposiciones sobre el uso asignado a cada

---

[42] La explicación ofrecida por la Opinión mayoritaria sobre porqué aplica en este caso la Ley 104 es a mi juicio insatisfactoria.  Véase nota al calce 15 de la Opinión del Tribunal.  La Mayoría lo que en efecto sostiene es que toda vez que el asunto referente al cambio de uso de las oficinas médicas surgía de la Escritura Matriz, lo allí dispuesto constituye un derecho adquirido.  Tal interpretación tiene el efecto de eviscerar la disposición de retroactividad de la Ley 103.  De ordinario, toda controversia entre condómines habrá de referirse a alguna disposición de la escritura matriz del condominio en cuestión, por lo tanto y siguiendo la lógica de la Opinión del Tribunal, todo aquello que se disponga en una escritura matriz es un derecho adquirido. **De facto**, el Tribunal ha dejado sin efecto los Arts. 1 y 44 de la Ley 103.  Discrepo de tal conclusión.

apartamiento en los artículos 2, 15(a) y 22(d). Dispone el primer artículo, en lo relevante:

> La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que este capítulo autorice lo contrario, una vez fijado dicho destino y uso sólo podrá ser variado mediante el consentimiento unánime de los titulares.

31 L.P.R.A. § 1291. El texto vigente antes de entrar en vigor la Ley 103 era similar, mas no incluía el cualificativo "excepto que este capítulo autorice lo contrario". 31 L.P.R.A. § 1291 (2003).[43] Por otro lado, no ha variado el texto pertinente de los artículos 15(a) y 22(d). Establecen estos, respectivamente, que cada apartamiento se dedicará sólo al uso pautado en la escritura matriz, y que ésta debe indicar claramente el "destino dado al inmueble y a cada uno de sus apartamientos." 31 L.P.R.A. §§ 1291m y 1292 (2003, 2004).[44]

Ahora bien, la Ley 103 incorpora al régimen una disposición especial relativa al cambio de uso de las áreas o locales comerciales o profesionales. Dispone el inciso (d) del artículo 38 de la Ley de Condominios, *inter alia*:

> En los condominios exclusivamente comerciales o

---

[43] Específicamente, la Ley Núm. 157 de 4 de junio de 1976 añadió la siguiente disposición, que hasta la Ley 103 no sufrió enmiendas pertinentes al caso de autos: "La escritura que establezca el régimen de Propiedad Horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares."

[44] Específicamente, los artículos 15 y 22 figuraban en la Ley 157 y no han sufrido enmiendas pertinentes al caso de autos.

profesionales, las dos terceras partes (2/3) de los titulares, que a su vez reúnan las dos terceras partes (2/3) de las participaciones en los elementos comunes del inmueble, podrán aprobar las obras de mejora[s] que estimen pertinentes, sin que para ello tenga que estar disponible el dinero en el fondo de reserva que se establece en este Artículo. Por igual número de votos, podrá variarse el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz.

*Supra*, § 1293b.

En cuanto al principio de la buena fe se refiere, la Ley 103 añadió varias disposiciones que pretenden aclarar su operación en el condominio. Hemos reconocido que se trata de un principio cuyos dictámenes permean todo el ordenamiento jurídico. Véase, *e.g.*, *Consejo de Titulares del Condominio Parkside v. Villa Edamorga*, res. 19 de mayo de 2006, 161 D.P.R. ___, 2004 T.S.P.R. 77. No obstante, la Ley de Condominios se ocupa de recalcar en su artículo 1-A:

En el ejercicio y el reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho.

Véase el "Historial" de 31 L.P.R.A. § 1291. Se añaden a esta norma unas disposiciones que matizan la oposición del titular a ciertos acuerdos del Consejo de Titulares. Con respecto a los acuerdos que precisan unanimidad, dispone el inciso (d) del artículo 38-C de la Ley de Condominios:

La oposición a un acuerdo que requiera unanimidad, deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta.

*Supra*, § 1293b-3.

**IV.**

Antes vimos que los artículos 2, 15(a) y 22(d) de la Ley de Condominios contienen tres preceptos: (1) la escritura matriz debe expresar clara y precisamente el uso de cada apartamiento, (2) estos podrán dedicarse sólo al uso indicado, y (3) toda enmienda a dicha expresión exige el consentimiento unánime de los titulares. Es menester precisar el alcance de estas reglas con miras a la redacción, estructura e historial de nuestra Ley de Condominios.

**A.**

El régimen de propiedad horizontal se ha concebido en nuestro ordenamiento como una figura jurídica cuyo propósito inmediato es facilitar la propiedad individualizada de los espacios de un inmueble que son susceptibles de aprovechamiento individual y comparten determinados elementos del inmueble. Art. 1-A, Ley de Condominios; *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 235-236 (1978); *Consejo Tit. Cond. McKinley Court v. Rullán*, 126 D.P.R. 387, 393 (1990); *Condominio Profesional San Juan Health Centre v. P.R.F., Inc.*, 133 D.P.R. 488, 489-490 (1993); *Soto Vázquez v. Vázquez Torres*, 138 D.P.R. 282, 289 (1995); *Brown III v. Junta de Directores Cond. Playa Grande*, 154 D.P.R. 225, 231 (2001); *Asoc. de Condóminos Quadrangle Medical Center v. Ramírez Lizardi*, 154 D.P.R. 699, 707 (2001); *Asoc. de Condóminos del Condominio Balcones de Santa María v. Los Frailes, S.E.*, 154 D.P.R. 800, 814 (2001) ("la esencia de la horizontalidad...[es] la coexistencia de diversos pisos de

dominio exclusivo con el condominio forzoso e inescapable de elementos comunes"). En términos más ilustrativos, aunque menos precisos, se trata de transformar una estructura física en múltiples estructuras jurídicas, para que donde antes cabía un sólo dominio, ahora quepan varios. De esta forma, el legislador ha querido lidiar con la escasez de viviendas y con la ausencia de un urbanismo ajustado a nuestros recursos ambientales y económicos. Véase: *Brown III v. Junta de Directores Cond. Playa Grande*, supra; *Álvarez Figueredo v. González Lamela*, 138 D.P.R. 958, 965 (1995); *Soto Vázquez v. Vázquez Torres*, supra, a las págs. 288-289; *San Juan Health Centre*, supra, a la pág. 490; *Maldonado v. Consejo de Titulares*, 111 D.P.R. 427, 429 (1981); *Arce v. Caribbean Home Const. Corp.*, supra, a las págs. 236 y 241-243; *Asoc. De Condóminos v. Naviera*, 106 D.P.R. 88, 91 (1977).

Dado que la propiedad horizontal facilita el dominio individualizado sobre los distintos espacios de un inmueble, los cuales comparten ciertos elementos del mismo, es necesario un esquema normativo que armonice los distintos derechos dominicales. Éste surge principalmente de la Ley de Condominios y de los documentos constitutivos del condominio, que son la escritura matriz y el reglamento.

### 1.

Uno de los problemas medulares en el desarrollo de nuestra Ley de Condominios ha sido el de procurar un balance apropiado entre la flexibilidad del régimen y la protección de los titulares. Tal balance resulta imperativo en la

consecución de un régimen capaz de resolver los problemas socio-económicos que animan la horizontalidad. Veamos.

Antes de surgir la legislación especializada sobre propiedad horizontal, el artículo 330 del Código Civil contenía las principales normas al respecto. 31 L.P.R.A. § 1275. Éstas resultaron insuficientes y dieron paso a la Ley 104, cuya aprobación respondió a la necesidad de establecer "una mecánica más amplia, detallada y clara sobre la materia de apartamientos, o sea, de los pisos de que habla el referido artículo 330 del Código Civil según ha sido enmendado." Informe de la Comisión de lo Jurídico Civil del Senado de Puerto Rico con respecto al P. de la C. 181, *Diario de Sesiones*, 22 de mayo de 1958, pág. 2004.[45] Empero, las múltiples lagunas de la Ley 104 aún ofrecían una amplia discreción a quienes organizaban el condominio y a los titulares en control del mismo.

Esa liberalidad figura entre los factores que produjeron las sustanciales enmiendas a la Ley de Propiedad Horizontal efectuadas mediante la Ley Núm. 157 de 4 de junio de 1976, cuya Exposición de Motivos indica el deseo de evitar los abusos y trastornos habidos en el condominio. Su historial legislativo sugiere, incluso, que uno de los principales cambios contemplados era establecer:

---

[45] También véase: Informe de la Comisión de lo Jurídico de la Cámara de Representantes con respecto al P. de la C. 181, *Diario de Sesiones*, 9 de mayo de 1958, pág. 1574; comentarios del Sr. Aponte en el hemiciclo de la Cámara de Representantes, *Diario de Sesiones*, 14 de mayo de 1958, pág. 1649.

> ...en detalle todo el ámbito de derechos y obligaciones de los titulares en cuanto a uso y disfrute de sus apartamientos, cobro de deudas por gastos comunes, incluyendo las acciones correspondientes en los tribunales.

Informe Conjunto de las Comisiones de lo Jurídico Civil, Desarrollo Urbano y Vivienda y Asuntos del Consumidor de la Cámara de Representantes con respecto al P. de la C. 1862, abril de 1976, pág. 4. Así se quiso procurar un balance más adecuado entre la flexibilidad del régimen y la protección del titular. Al cabo de varias décadas, la Ley de Condominios constituye otro esfuerzo por lograr ese balance adecuado, encaminado principalmente a flexibilizar el régimen. Concluye su Exposición de Motivos que dicha Ley pretende "garantizar procesos más eficientes y justos que en última instancia serán de gran beneficio para toda nuestra comunidad." Véase, además, *Consejo de Titulares v. Williams Hospitality Group*, *supra*.

Ahora bien, el historial de la Ley de Condominios revela una especial preocupación por atender ciertos intereses del titular residencial.[46] De ahí que la Ley ofrezca

---

[46] A modo de ejemplo, la Exposición de Motivos de la Ley 157 señala:

> Existen intereses de índole pública que el Gobierno está obligado a atender con preferente consideración. Así deben prevenirse posibles abusos contra futuros adquirentes de apartamentos residenciales, que dificulten el logro de la política pública sobre utilización de terrenos del Estado Libre Asociado de Puerto Rico que se dirige a estimular que las familias puertorriqueñas residan en proyectos multi-familiares. Es necesario brindar igual protección a los ya titulares de apartamentos residenciales a fin de evitar que se perpetúen los abusos cometidos contra

determinadas garantías al titular residencial y las niegue a los titulares de condominios exclusivamente comerciales o profesionales.[47]  Nuestro legislador parece entender que el balance adecuado entre la flexibilidad del régimen y la protección del titular es distinto en dichos condominios, ya sea porque las actividades comerciales y profesionales exigen mayor flexibilidad, porque esos titulares suelen proteger sus intereses con más efectividad, o porque sus intereses merecen menos protección.

**2.**

Con respecto a la escritura matriz, hemos indicado que se trata de un estatuto privado al cual se adhieren los titulares, ya sea cuando someten el inmueble a la horizontalidad o cuando adquieren algún apartamiento. *Consejo de Titulares v. Vargas*, 101 D.P.R. 579, 582-583 (1973); *San Juan Health Centre*, *supra*, a las págs. 501-502. Véase, también: *Brown III v. Junta de Directores Cond. Playa Grande*, *supra*, a las págs. 234-235.  Así obtiene gran flexibilidad al régimen de propiedad horizontal, mediante la ordenación privada de los condominios.

Sin embargo, nuestro legislador ha reglamentado esta figura para ofrecer ciertas protecciones a los titulares.  Se

---

éstos [sic] en el pasado.
Leyes de Puerto Rico, 1976, pág. 486.  También véase el Informe Conjunto de las Comisiones de lo Jurídico Civil, Desarrollo Urbano y Vivienda y Asuntos del Consumidor de la Cámara de Representantes con respecto al P. de la C. 1862, abril de 1976, págs. 2-3.

[47] Por ejemplo, véase el artículo 38(d), *supra*, y el artículo 38-B, 31 L.P.R.A. § 1293b-2.

procura, por un lado, que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, ofrezcan a los titulares una descripción adecuada y confiable del condominio. De ahí que las enmiendas a la escritura precisen el consentimiento unánime de los titulares, y que sea ineludible expresar inequívocamente ciertas cuestiones.

Hemos reconocido, por otro lado, que la Ley de Condominios limita el contenido de la escritura matriz. Ciertamente, el texto estatutario no siempre aclara si las normas pautadas son imperativas o dispositivas. Pero hemos visto que el historial legislativo revela un intento de procurar el balance más apropiado entre la flexibilidad del régimen y la protección de los titulares, precisamente, contra los efectos de tal flexibilidad. Como el uso de los apartamientos es un elemento importante del derecho condominal, su reglamentación incide poderosamente sobre el susodicho balance legislativo. Ello nos convence de que la tendencia en nuestra legislación ha sido la de pautar normas que limiten el contenido de la escritura matriz en cuanto al uso de los apartamientos.

Lo anterior explica nuestra actitud desfavorable hacia las reservas de derechos efectuadas en la escritura matriz. En *Álvarez Figueredo v. González Lamela*, *supra*, resolvimos que el Consejo de Titulares puede autorizar una sobreelevación privativa, cumplido el requisito de unanimidad, pero ese derecho no es reservable. Explicamos

que "[l]a prohibición de reservar el derecho de sobreelevación a favor de un particular no tiene otro propósito que proteger a los titulares de los desmanes negociadores del desarrollador o del titular inicial único del condominio." También véase: *Consejo de Titulares del Cond. Galerías Ponceñas v. Galerías Ponceñas*, 145 D.P.R. 315 (1998).

**B.**

El recurso de epígrafe nos convida a examinar los artículos 2, 15(a) y 22(d) en un contexto muy particular: el de las restricciones de uso contenidas en la escritura matriz de un condominio exclusivamente comercial o profesional.

Adviértase, por un lado, que las reglas pautadas en dichos artículos responden a tres imperativos distintos: primero, establecer el uso de las áreas comunes; segundo, indicar si los apartamientos son residenciales o comerciales; tercero, advertir sobre cualquier limitación adicional al uso de los apartamientos. La distinción es relevante a la hora de precisar la intención legislativa con respecto a los artículos 2, 15(a) y 22(d). En el caso de los apartamientos, por ejemplo, obsérvese que la designación 'residencial' o 'comercial' es mandatoria,[48] mas no así las restricciones adicionales de uso. Nuestra Ley de Condominios exige una expresión en la escritura matriz con respecto al uso

---

[48] Nótese que esa designación tiene que ser clara y precisa, mas no expresa. El uso "oficina médica", por ejemplo, da a entender clara y precisamente que el apartamiento es comercial.

residencial o comercial de los apartamientos, y permite que la escritura matriz establezca otras limitaciones de uso. *Vázquez Soto v. Vázquez Torres*, *supra*, a las págs. 290-291; *San Juan Health Centre*, *supra*, a la pág. 504.

Estas restricciones de uso, contenidas en la escritura matriz, limitan el dominio sobre los apartamientos. Por ende, hemos insistido en que su redacción sea clara y precisa. Sólo de este modo se informa adecuadamente y sin ambigüedades el contenido de la norma a los titulares y demás interesados. Así mismo, hemos señalado que las restricciones de uso serán interpretadas estricta y restrictivamente.[49] *Soto Vázquez v. Vázquez Torres*, *supra*, a las págs. 290-291.

Por otro lado, conviene subrayar que nos enfrentamos a una controversia entre los titulares profesionales de un condominio exclusivamente comercial y profesional. Hemos visto como el historial de la Ley de Condominios revela que el balance adecuado entre la flexibilidad del régimen y la protección del titular se inclina hacia la flexibilidad en dichos condominios. Ello incide sobre nuestra apreciación de la intención legislativa con respecto a las restricciones de

---

[49] Ciertamente, habíamos indicado en *San Juan Health Centre v. P.R.F., Inc.*, 133 D.P.R. 488, 405 (1993) que "de surgir dudas en cuanto a la especificidad de los usos consignados en la Escritura Matriz, debemos atender a la voluntad de las partes al consignar éstos en la escritura y al adquirir los apartamientos en cuestión." (citas omitidas). En el contexto de las servidumbres en equidad, compárese: *Rodríguez Pérez v. Gómez*, 156 D.P.R. 307 (2002); *Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke v. Banco Santander de P.R.*, res. 28 de junio de 2002, 157 D.P.R. ___, 2002 T.S.P.R. 97. Resulta innecesario examinar este asunto, toda vez que la controversia de marras se refiere a la configuración de una restricción y una reserva, no a su especificidad.

uso contenidas en la escritura matriz de un condominio exclusivamente comercial o profesional.

### C.

En el epicentro de esta controversia radica nuestra decisión en *Condominio Profesional San Juan Health Centre v. P.R.F., Inc.*, 133 D.P.R. 488 (1993).[50] Se trataba en aquel litigio de un condominio dedicado principalmente a ofrecer servicios de salud. La escritura matriz disponía que ciertas unidades se dedicarían exclusivamente al uso de oficina médica. Otras unidades, cuyo título retuvo el desarrollador, se dedicarían a varios usos específicos. Ahora, el reglamento del condominio especificaba el uso de cada oficina médica e indicaba que el propósito era garantizar a cada titular la exclusividad de su práctica especializada en el condominio.

La controversia surgió cuando el desarrollador intentó variar el uso de la oficina 701, para venderla, provocando eventualmente una demanda de *injunction* del Consejo de Titulares. Ripostó el desarrollador que la cláusula 13(b) de la escritura matriz le permitía, entre otras cosas, "variar el uso y destino de los apartamientos y áreas del edificio que retenga y/o adquiera en el futuro." También invocó el artículo 33(d) del reglamento, según el cual todo cambio de uso de las oficinas exigía el consentimiento expreso y escrito del desarrollador y del titular de toda oficina

---

[50] Véase, además: *Consejo de Titulares del Cond. Galerías Ponceñas v. Galerías Ponceñas*, 145 D.P.R. 315 (1998).

dedicada a la nueva especialidad. Cuando el foro primario declaró nulas ambas disposiciones y concedió el *injunction* solicitado, el desarrollador acudió sin éxito ante nosotros.

La Opinión de este Tribunal considera tres asuntos pertinentes al caso de autos.[51] Primero se discute si la reserva del desarrollador en la escritura matriz era válida. Al respecto indicamos que "retener el derecho *a variar unilateralmente el uso de los apartamientos*" era contrario a la Ley de Propiedad Horizontal y, por ende, "no erró el foro de instancia al decretar la nulidad de la referida cláusula..." 133 D.P.R. a la pág. 503 (énfasis original). Luego se discute si los hechos del caso configuraban un cambio del uso asignado en la escritura. Al contestar en la afirmativa, indicamos que dicho uso puede ser de carácter general (*e.g.*, "uso comercial") y que puede especificarse mediante el reglamento.[52] También enfatizamos que el

---

[51] También se discute, como cuestión de umbral, la capacidad del Consejo de Titulares, representado por la Junta de Directores y su Presidente, para instar la demanda.

[52] Sobre este particular, indicamos en *Soto Vázquez v. Vázquez Torres*, 138 D.P.R. 282, 296-297 (1995):

> ...entendemos que no se da aquí la situación presente en *Cond. Prof. S.J. H. Centre v. P.R.F., Inc.*, supra. En el caso de autos no existe una referencia directa al reglamento en la escritura similar a la existente en *Cond. Prof. S.J. Centre v. P.R.F., Inc.*, supra. Es decir, en la escritura matriz del Centro no se incluyó una referencia directa a que la restricción específica de uso a cada uno de los apartamentos se fijarían en el Reglamento. Por ende, ambas fuentes de obligaciones se mantuvieron separadas de manera que el reglamento no adquirió el valor obligacional de la escritura.

Más aún, en este caso, contrario a *Cond. Prof. S.J.*

reglamento del condominio garantizaba a los titulares la exclusividad, garantía que fue determinante en la voluntad de los demandantes al adquirir sus apartamientos. Por último, examinamos si era válido el artículo 33(d) del reglamento, el cual consideramos nulo por infringir el artículo 37 de la Ley de Propiedad Horizontal, disposición que atendía la modificación del reglamento.

El anterior resumen nos permite apreciar un silencio en el análisis de *San Juan Health Centre*.[53] Allí indicamos que las restricciones de uso son opcionales y no deben enumerarse necesariamente en la escritura matriz. Luego resolvimos que la reserva del derecho de variar un uso es contraria a la Ley de Propiedad Horizontal. Surge entonces la pregunta: si el desarrollador de un condominio no viene obligado a limitar el uso de los apartamientos, ¿por qué negarle la opción de establecer una restricción sujeta a determinadas condiciones

---

*H. Centre v. P.R.F., Inc.,* *supra*, no se estableció una limitación general al uso de los locales en la escritura que sería limitado a un uso particular en el Reglamento. Por el contrario, el Reglamento no establece limitación particular alguna al uso comercial de los locales dispuesto en la escritura.

[53] Dicho resumen nos permite apreciar, además, una dificultad con la interpretación de los peticionarios y del foro sentenciador. Sostienen estos que la reserva del desarrollador para variar el uso asignado a los apartamientos en la escritura matriz es inválida sólo cuando se trata de un condominio comercial o profesional donde los titulares tienen una garantía de exclusividad y la reserva no se limita al periodo inicial de ventas. Alegato SEAM, págs. 12-15. Empero, nuestra Opinión en *San Juan Health Centre*, *supra*, se refiere al elemento de exclusividad para precisar si hubo un cambio del uso establecido en la escritura matriz, habiéndose ya resuelto, sin dimes ni diretes, que era nula la reserva del desarrollador en ella contenida.

o reservas?  El texto estatutario no ofrece una respuesta adecuada a dicha pregunta.[54]

La respuesta resulta evidente a poco que reflexionemos sobre los hechos de *San Juan Health Centre*.  La reserva invocada era incondicional y unilateral.  Al ser incondicional, la misma soslayaba totalmente uno de los principios de nuestro régimen condominal, *viz.*, que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, ofrezcan a los futuros titulares una descripción adecuada y confiable del condominio.  Al ser unilateral e incondicional, la cláusula dejaba de ofrecer la protección que nuestro legislador había establecido en cuanto a las restricciones de uso contenidas en el reglamento.  Tales circunstancias hicieron innecesario que examináramos la validez de otras reservas y condiciones.

Discrepamos igualmente del análisis hecho por la mayoría de nuestro dictamen en *Condominio Profesional San Juan Health Centre*, pues allí no se resolvió la controversia planteada en este caso.  Este asunto quedó sobre el tapete en aquella ocasión.

_____

[54] Éste indica, en el artículo 2, que la escritura matriz debe fijar el destino y uso de cada apartamiento, y que, una vez fijado **dicho destino y uso**, sólo podrá variarse mediante el consentimiento unánime de los titulares.  Nótese como ese lenguaje admite dos interpretaciones.  Una sostiene que el requisito específico de unanimidad aplica sólo cuando se trata de un uso cuya expresión en la escritura matriz es mandatoria.  La otra interpretación sostiene que dicho requisito aplica a cualquier expresión de uso en la escritura matriz --es decir, que el segundo precepto del artículo 2 opera independientemente del primero.

**D.**

La controversia de autos nos presenta una situación fáctica más compleja y delicada que la de *San Juan Health Centre*, lo cual nos obliga a emprender la tarea allí pendiente. El criterio rector de nuestro análisis es procurar aquellas reglas capaces de lograr el balance más adecuado de los principios colegidos del historial legislativo, ya resaltadas: facilitar la flexibilidad del condominio, ofrecen una garantía a los titulares con relación a las características de su derecho condominal, y proteger determinados intereses contra los efectos de la organización privada del condominio.

Antes bien, observamos que las restricciones de uso presentan un dilema para los desarrolladores. Por un lado, tales restricciones tienen el potencial de producir un condominio más atractivo para quienes desean, por ejemplo, alguna garantía contra la presencia de ciertas actividades en el condominio. Además, las restricciones de uso benefician a todos los condóminos en la medida que disminuyen las pugnas internas con respecto al uso de los apartamientos. Por otro lado, un régimen de usos limitados carece de flexibilidad, tanto para el desaorrollador como para los titulares, lo cual acarrea pérdidas económicas y hedónicas. Ello se debe a que las restricciones contenidas en la escritura matriz sólo podrán variarse con el consentimiento unánime de los condóminos; las que se incorporan al reglamento, con el consentimiento de dos terceras partes de los titulares y las

participaciones.[55]

El problema reseñado admite solución mediante las cláusulas cuyo ejercicio o cumplimiento afecta el contenido o eficacia de las restricciones de uso. Ciertamente, estos mecanismos son capaces de soslayar uno de los principios medulares de nuestro régimen, *viz.*, que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, deben ofrecer una descripción adecuada y confiable del condominio. Pero dicha garantía no es absoluta. Por ejemplo, el titular que descansa en una limitación de uso contenida en el reglamento habrá de tener presente que ésta podría enmendarse con el consentimiento de dos terceras partes de los titulares y las participaciones. Somos del criterio, pues, que nuestro legislador no ha rechazado la posibilidad de una reserva o condición que brinde suficiente seguridad al titular con respecto al uso de los apartamientos.

La seguridad aludida puede surgir de tres modos. En primer lugar, es posible redactar una restricción de uso que incorpore cierta flexibilidad en la descripción del uso. Tal sería el caso, por ejemplo, de una cláusula para establecer que el apartamiento 1-A será dedicado al negocio de

---

[55] El requisito de dos tercios surge del artículo 37 de la Ley de Condominios, *supra*, § 1293a. Nos abstenemos de expresar un criterio sobre la relación de ese precepto con otras normas de la misma ley y de su jurisprudencia, particularmente el inciso (d) del artículo 38, antes citado ("[p]or igual número de votos, podrá variarse el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz.").

restaurante japonés o de cualquier especialidad culinaria que no estuviera representada en el condominio, según su escritura matriz. Aquí la restricción es clara y precisa, pues basta con examinar dicha escritura para determinar cuales son los usos permitidos.

En segundo lugar, es posible que la reserva cumpla el *quantum* mínimo que ha pautado la Ley para los cambios de uso en condominios comerciales o profesionales, o sea, el de dos terceras partes de los titulares y las participaciones. La escritura matriz podría establecer, por ejemplo, que el apartamiento 1-A se dedicará al negocio de restaurant, a menos que el 90% de los condóminos y las participaciones autoricen un cambio de uso.

Por último, es posible que se trate de una restricción de uso sujeta a determinada condición resolutoria o modificativa, siempre que ésta no sea rigurosamente potestativa. Ejemplo de ello sería la disposición de que el apartamiento 1-A habrá de utilizarse para el negocio de taverna, a no ser que se denieguen los permisos pertinentes, en cuyo caso se dedicará a cualquier uso comercial o profesional. Aquí los titulares y demás interesados no pueden precisar con certeza el uso que tendrá dicho local. Pero la escritura matriz les ofrece unos criterios relativamente objetivos para determinar si asumen el riesgo, toda vez que la discreción del titular está condicionada a la denegación de cierto permiso.

Las características reseñadas garantizan, además, un

nivel adecuado de protección a los titulares comerciales o profesionales. Estos suelen contar con el incentivo y la capacidad para examinar cuidadosamente los documentos constitutivos del condominio. Siempre que la reserva o condición surja clara y precisamente de estos, tal como debe surgir la correspondiente restricción de uso, según *Soto Vázquez v. Vázquez Tores*, *supra*, es de presumir que ésta formará parte del juicio comercial. Dicho análisis será más factible en la medida que hayamos eliminado la discreción del reservista. Nada sugiere que el legislador haya contemplado una mayor protección de los titulares comerciales o profesionales.

Muy distinto es el panorama cuando se trata de una reserva, estrictamente hablando, o una condición rigurosamente potestativa. Aquí los titulares y demás interesados carecen de una base adecuada para asumir o rechazar el riesgo (a no ser que sepan la intención del titular o sean indiferentes al uso). Incluso, estas cláusulas son capaces de brindar incentivos perversos al desarrollador. Cierto comentarista nos ofrece un ejemplo ilustrador, en el contexto de las urbanizaciones residenciales y sus condiciones restrictivas:

> However, the homeowners could have interests that strongly diverge from the developer and they could be the losers with amendment and modification power being retained by the developer. For example, the Company could theoretically market the bulk of the residential lots, then release the covenants on the remaining land and sell to commercial users. Commercial entities would pay a premium price to the Company to be one of the few businesses surrounded by many residential customers (a quasi-

> monopoly position). Thus the Company may have an incentive to release or modify the covenants even though the homeowners would object to introduction of commercial uses in their residential community. During the early stages of marketing the subdivision, the Company might be unlikely to so frustrate owner expectations since that would hurt its attempts to sell lots to other customers; but in the latter stages of the development, that market constraint would be reduced.

G. Corngold, *The Emergence of Private Land Use Controls in Large-Scale Subdivisions: The Companion Story to* Village of Euclid v. Ambler Realty Co., 51 Case W. Res. L. Rev. 617, 631-632 (2001) (cita omitida).

**E.**

Con el fin de precisar la norma antes pautada, y su fundamento, conviene examinar una de las posturas que asume la SEAM en su Alegato. Ésta nos invita a resolver que son válidas las reservas razonables e inválidas las irrazonables. Hemos visto como la Ley de Condominios procura establecer un balance apropiado de la flexibilidad del régimen y la protección de los titulares. La SEAM arguye, esencialmente, que las reservas razonables armonizan con dicho criterio, toda vez que responden a los intereses legítimos del desarrollador y constan en la escritura matriz.

Sin duda que el criterio de razonabilidad figura entre los factores pertinentes a la hora de evaluar una reserva o condición. Nuestra Ley de Condominios está matizada por el principio de la buena fe, principio que, evidentemente, milita contra una disposición irrazonable de su faz o en su aplicación. Y debemos reconocer que el criterio de razonabilidad podría afectar el desarrollo de las reglas aquí

pautadas.   De hecho, alguna distinción entre reservas razonables e irrazonables ha venido a ser una solución muy acogida en el contexto de los convenios restrictivos estadounidenses.[56]   Algunos tribunales han aplicado dicha norma a los condominios,[57] y las restricciones de uso condominales se evalúan frecuentemente con miras al criterio de razonabilidad.[58]

---

[56] Véase, por ejemplo: *Wright v. Cypress Shores Development Co.*, 413 So. 2d 1115 (Ala. 1982); *Flamingo Ranch Estates v. Sunshine Ranches Homeowners*, 303 So.2d 665, 666 (Fla. App. 1974).   Son ilustrativas las siguientes expresiones del Tribunal en *Flamingo Ranch Estates*, *id.* (citas omitidas), toda vez que puntualizan una de las dificultades que entrañan las reservas:

> In a sense, there is an inherent inconsistency between an elaborate set of restrictive covenants designed to provide for a general scheme or plan of development (generally considered to be for the benefit of the respective grantees), and a clause therein whereby the grantor reserves to itself the power at any time in its sole discretion to change or even arbitrarily abandon any such general scheme or plan of development (a power which is solely for the benefit of the grantor).  When such occurs, as it has in this case, rules of construction require that clauses which are apparently inconsistent with or repugnant to each other be given such an interpretation and construction as will reconcile them, if possible.

> In the instant case, this can be done by reading into the reservation clause a requirement of reasonableness... We hold, therefore, that the clause in the Declaration of Restrictions, which reserves to the owner 'the right to alter, amend, repeal or modify these restrictions at any time in its sole discretion' is a valid clause so long as it is exercised in a reasonable manner as not to destroy the general scheme or plan of development.

[57] Véase, *e.g.*: *Scott v. Sandestin Corp.*, 491 So. 2d 334 (Fla. App. 1986); *Queen's Grant II Horizontal Property Regime v. Greenwood Development Corp.*, 628 S.E. 2d 902 (S.C. Ct. App. 2006).

[58] Esta casuística se ha discutido ampliamente en los

No podemos convenir con la SEAM, sin embargo, cuando sostiene que todo gira en torno a si las reservas son razonables o irrazonables. Esa postura deja de apreciar la necesidad de ofrecer una garantía adecuada con respecto a las características del derecho condominal, y de proteger a los titulares contra los desmanes negociadores de quien establece el condominio. Aquí nuestra legislación se aparta de aquellas jurisdicciones estadounidenses que han optado por un régimen más flexible.[59] Consecuentemente, procuramos

_____

estudios sobre las restricciones de uso incorporadas a los convenios restrictivos y los condominios. Véase, *e.g.*: *Judicial Review of Condominium Rule Making*, 94 Harv. L. Rev. 647 (1981); C. B. Kress, *Beyond Nahrstedt: Reviewing Restrictions Governing Life in a Property Owner Association*, 42 U.C.L.A. L. Rev. 837 (1995); R. G. Natelson, *Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners Association*, 51 Ohio State L. J. 41 (1990); D. R. Puterbaugh, *The Reasonable Pet: An Examination of the Enforcement of Restrictions in California Common Interest Developments After Nahrstedt v. Lakeside Village Condominium Ass'n, Inc.*, 36 Santa Clara L. Rev. 793 (1996); P. A. Randolph, Jr., *Changing the Rules: Should Courts Limit the Power of Common Interest Communities to Alter Unit Owners' Privileges in the Face of Vested Expectations?*, 38 Santa Clara L. Rev. 1081 (1998); L. A. Schiller, *Limitations on the Enforceability of Condominium Rules*, 22 Stetson L. Rev. 1133 (1993).

[59] Esta valoración distinta que han adoptado ciertas jurisdicciones estadounidenses se desprende, no sólo de los casos y los estudios citados anteriormente, sino de las normas endosadas en el *Uniform Condominium Act (1980)* y el *Uniform Common Interest Ownership Act (1994) (UCIOA)* de la National Conference of Commissioners on Uniform State Laws (NCCUSL). Uniform Laws Annotated, West, 2006. Según la *Prefatory Note* del UCIOA (1994), "by 1994, UCIOA [1982] had become the law in at least five States, while the Uniform Condominium Act, or substantially similar laws, exist in 21 States." A su vez, este modelo ha sido adoptado sustancialmente en dos estados (uno de los cuales había adoptado el UCIOA de 1982). Véase: Uniform Laws Annotated, Uniform Common Interest Ownership Act (1994) References & Annotations, West, 2006.

establecer unos requisitos capaces de reducir la incertidumbre, el costo y los inconvenientes incidentales a la determinación judicial o administrativa sobre razonabilidad.

**V.**

Los peticionarios invocan el principio de la buena fe para sostener que procede desatender la oposición de los demandantes-recurridos al cambio de uso en controversia.[60] Este principio, ubicuo en nuestro ordenamiento, admite múltiples definiciones y aplicaciones que matizan tanto la Ley de Condominios como la Ley de Propiedad Horizontal. Veamos la modalidad más pertinente el caso de autos.

Anteriormente se indicó que la Ley de Condominios incluye varias disposiciones encaminadas a precisar los imperativos de la buena fe condominal. Entre ellas figura el artículo 38-C(d) sobre la oposición a los acuerdos del Consejo de Titulares necesitados de unanimidad. Dispone dicho artículo que la oposición "deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta."

Al reflexionar sobre este precepto, colegimos que establece dos reglas. La primera es que resulta inaceptable

---

[60] Observamos que no está claro si dicho cambio de uso debe considerarse un acuerdo —-válido o inválido-- del Consejo de Titulares. Dado que las partes no han discutido este punto en sus alegatos, adjudicaremos el caso como si se tratara de tal acuerdo.

la oposición del titular cuya postura esté motivada exclusivamente por el capricho, el encono, la animadversión o la mera potestad. En segundo lugar, resulta inadecuada la oposición del titular que falte al deber de fundamentarla expresamente a través de los mecanismos indicados. Como remedio, en ambos casos, la oposición se tendrá por no puesta.

La primera de estas reglas es un corolario del principio de la buena fe. Cualesquiera que sean sus dictámenes particulares, ese principio se nutre de un postulado ético que nos exige alguna razón suficiente para perjudicar el bienestar de otra persona, y que rechaza las razones fundadas en el deseo de causar o retribuir un daño, en la pre-potencia y en la indiferencia. Quien se opone a un acuerdo del Consejo de Titulares, sin existir más razón que las indicadas, incumple ese imperativo y obra de mala fe. Como expresamos en *Asoc. de Condóminos Quadrangle Medical Center v. Ramírez Lizardi*, *supra,* a la pág. 712 n. 5, "la negativa de un titular en aquellos casos donde se requiere consentimiento unánime no puede ser arbitraria y caprichosa." También hemos indicado que abusan del derecho y proceden con mala fe los titulares cuya oposición responde al empeño de incumplir sus obligaciones condominales. *Consejo de Titulares del Cond. Galerías Ponceñas v. Galerías Ponceñas*, *supra*, a las págs. 340-341 (1998).

Falta por identificar el remedio apropiado cuando algún condómino se opone indebidamente --según el principio de la

buena fe-- a un acuerdo que precisa unanimidad. Resulta ineludible concluir que los foros judiciales y administrativos están facultados para desatender la oposición y confirmar el acuerdo retroactivamente.[61] Es un postulado de nuestro ordenamiento el que procura evitar los frutos de la mala fe.[62] Cuando un titular se opone a los acuerdos del Consejo de Titulares que precisan unanimidad, se minimizan los beneficios de su conducta con un tachazo. En *Galerías Ponceñas*,[63] determinamos que se podía excluir de ciertas decisiones al titular mayoritario incurso en un claro abuso del derecho. Por supuesto, habrán circunstancias en las cuales será inapropiado tachar la oposición ilícita, como, por ejemplo, cuando la verificación tardía del acuerdo

---

[61] Adviértase que no consideramos la posibilidad de otros remedios. También vale la pena subrayar que estamos examinando los acuerdos por unanimidad. Más delicada sería la pregunta de si el remedio indicado aplica a todos los acuerdos. Observamos, por ejemplo, que las decisiones sujetas al criterio de unanimidad son excepcionales, mientras que los acuerdos mayoritarios son relativamente frecuentes y existe, entonces, un mayor interés en su estabilidad.

[62] Existe un sinnúmero de normas ilustrativas de este principio. Por ejemplo, los derechos y obligaciones del poseedor vencido varían sustancialmente según su buena o mala fe. Véase, *e.g.,* los artículos 296-300, 380-384, 386 y 393 del Código Civil, 31 L.P.R.A. §§ 1163-1167, 1466-1470, 1472 y 1479.

[63] S*upra*, a las págs. 341-342: "...en situaciones como la de autos, en las que un titular posee una participación mayoritaria en los elementos comunes y, a su vez, pretende ejercer sus derechos como titular en una forma que constituye un claro abuso de derecho, la Junta de Directores está facultada para excluirlo de las votaciones que realice para obtener el consentimiento del Consejo de Titulares para instar procedimientos judiciales en su contra y para excluir su participación en los elementos comunes del edificio en el cómputo que se realiza para determinar la concurrencia de mayoría, según ésta es definida en la Ley de Propiedad Horizontal y en el Reglamento de Administración."

perjudicará los intereses de terceros inocentes.  Y se debe recordar que el principio de la buena fe está atado a una presunción de buena fe.  Véase, *e.g.*:  *McConnell Jiménez v. Palau Grajales*, res. 5 de mayo de 2004, 161 D.P.R. ___, 2004 T.S.P.R. 69; *B.W.A.C. Int'l v. Quasar Co.*, 138 D.P.R. 60, 71 n. 8 (1995); *Citibank v. Dependable Insurance Co.*, 121 D.P.R. 503, 519 n. 11 (1988); *Cervecería Corona v. Commonwealth Insurance Co.*, 115 D.P.R. 345, 351 (1984) ("La buena fe se presume. Quien reclama la mala fe debe probarla.").

## VI.

Al inicio de la sección III indicamos las cuatro preguntas medulares en este caso.  ¿Cuál es la ley aplicable?  Según dicha ley, ¿hubo una restricción de uso con respecto a la oficina 518?  Si la hubo, ¿existe una reserva lícita del derecho a variar tal uso?  Si no existe, ¿procedieron de mala fe los demandantes-recurridos al rechazar el cambio de uso propuesto?

### A.

La Ley de Condominios aplica prospectiva y retroactivamente a todos los inmuebles sometidos al régimen de propiedad horizontal, pero la Ley de Propiedad Horizontal rige las controversias derivadas de hechos acaecidos durante su vigencia que configuran un derecho adquirido.  Las circunstancias de este caso cumplen ambos requisitos, toda vez que la putativa derrota del acuerdo condominal ocurrió antes del 4 de julio de 2003, y tal suceso constituye un derecho adquirido.  Valga recalcar, sin embargo, que la Ley

de Propiedad Horizontal está matizada por el principio de la buena fe.

**B.**

Veamos si la Escritura Matriz configura una restricción de uso sobre la oficina 518 y una reserva lícita a favor de la SEAM.

A pesar de su complicada redacción, es posible resumir el contenido medular de la Escritura Matriz. El párrafo 5 establece que las oficinas se dedican exclusivamente a la prestación de servicios profesionales relacionados con la salud, que toda oficina tiene un uso específico al cual será dedicda, y que el uso específico de la oficina 518 es el de otorrinoloringología. El párrafo 27(a) reitera estas expresiones al señalar que "se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina, según listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO."

Acto seguido, el párrafo 27 añade dos cosas: (1) "en el futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador...usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura"; (2) tal uso podrá variarse sólo cuando el titular obtenga el consentimiento escrito y unánime de los condóminos o "cuando sea para una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura". Igualmente, hemos visto que los párrafos 27(c) y 27(e)

permiten un cambio de uso cuando el comprador elegible --según la prelación establecida-- ejerza otra especialidad o cuando el titular procure una subespecialidad (*e.g.*, de medicina interna a cardiología).

Al palio de las disposiciones reseñadas, no cabe duda que la Escritura Matriz establece una restricción de uso. Más allá de su destino comercial-profesional, la oficina 518 está limitada a la especialidad médica de otorrinolaringología u otra ausente del párrafo 5. Por supuesto, dicha restricción está sujeta a varias condiciones modificativas, relacionadas con la re-venta del apartamiento y las futuras subespecialidades del titular. Pero dichas condiciones no desvirtuan el tenor claro del párrafo 5 de la Escritura Matriz.[64]

Los peticionarios sostienen, sin embargo, que el párrafo 27(a) establece una reserva a favor de la SEAM para variar el uso de las oficinas antes de su primera venta. Somos del criterio que la disposición invocada dista muchísimo del lenguaje capaz de constituir una reserva o condición exigible.[65] Ciertamente, el Tribunal de Primera Instancia

---

[64] El Tribunal de Primera Instancia resolvió lo contrario por entender que la putativa reserva del párrafo 27(a), la cual examinamos a continuación, hace obscura la restricción de uso. *Supra*, págs. 967-968. Este planteamiento suscita un círculo vicioso: como la restricción y la reserva tienen que ser claras, si tal reserva hace obscura tal restricción, también la restricción hará obscura la reserva. Por eso es que debemos examinar estas disposiciones independientes las unas de las otras.

[65] El párrafo 27(a) puede interpretarse razonablemente como que está dirigido a los futuros titulares y no al desarrollador. Tal análisis sostiene que la cláusula "en el

estimó probado que las partes tuvieron la intención de establecer una reserva. Pero el requisito de forma se dirige, precisamente, a circunscribir la discreción del juzgador. Toda reserva o condición debe surgir inequívocamente de la escritura matriz.

Los vicios de la putativa reserva superan su obscuridad. Interpretada literalmente, ésta facultó a la SEAM para variar el uso de cada oficina antes de su primera venta. No se trata, evidentemente, de una disposición compatible con el *quantum* decisional aplicable. Tampoco se trata de una definición del uso asignado. Estamos ante una reserva, sujeta a la única condición de que el desarrollador no podría vender el apartamiento, re-adquirirlo, y luego cambiar su uso. La SEAM aduce con verosimilitud que el propósito de esta disposición era facilitar la venta de aquellas oficinas cuya especialidad asignada no tuviese acogida. Sin embargo, el párrafo 27(c) de la Escritura Matriz demuestra que era posible redactar una disposición ajustada a tal propósito. La SEAM optó por no limitar su discreción. En fin, la putativa reserva del párrafo 27(a) es inválida por no tener alguna de las tres características que hemos reseñado.[66]

---

futuro, luego de realizada la individualización y primera venta" pretende indicar que el párrafo se dirige exclusivamente a los nuevos titulares. Los peticionarios aducen, en cambio, que dicha cláusula tuvo el propósito de establecer cuando y a quien aplicarán los usos especificados en el párrafo 5. Ninguna de estas interpretaciones es irrazonable. Por ende, la supuesta reserva es ambigua.

[66] Dada la invalidez de esta reserva, su reproducción en la escritura de compraventa de los demandantes-recurridos no puede configurar el consentimiento al cambio de uso a que se

**C.**

Habiéndose resuelto que la oficina 518 está sujeta a una restricción de uso, y que no existe la reserva invocada, es evidente que el cambio de uso impugnado estaba sujeto al requisito de unanimidad. Resta por determinar si los demandantes-recurridos se opusieron adecuadamente a dicho cambio.

Aquí los peticionarios invocan el principio de la buena fe. Sostienen que la oposición del Dr. Serrano Muñoz fue infundada y frustró las expectativas legítimas que tenía la SEAM en su relación contractual con los demandantes-recurridos. Estos aducen, en cambio, que su oposición respondió principalmente a dos consideraciones. Por un lado, deseaban evitar la competencia que implica una mega-práctica de cardiología. Se arguye, en otras palabras, que los Doctores Redondo y Lastra podrían unir las oficinas 516 y 518, lo cual les permitiría establecer un consultorio con facilidades más atractivas y con el beneficio de un laboratorio privado. Por otro lado, los demandantes-recurridos invocan su interés económico en limitar el número de oficinas dedicadas a la cardiología, especialmente cuando la SEAM les dio a entender que sólo habría cinco de tales oficinas. *Alegato de la Parte Recurrida*, págs. 10-11.

**1.**

Es menester comenzar con ciertas observaciones de

---

refiere *Consejo de Titulares del Condominio Parkside v. M.G.I.C. Financial Corp.*, 128 D.P.R, 538 (1991).

carácter procesal. Los demandantes-recurridos solicitan un *injunction* para limitar el uso de la oficina 518 a la otorrinolaringología. Tal causa de acción exige prueba de que (1) la oficina 518 está limitada al referido uso, (2) éste se ha variado, y (3) no se observaron los requisitos pertinentes para ello. Los demandantes probaron hechos tendientes a establecer la restricción y el cambio de uso. Con respecto al tercer punto, hemos visto que dicho cambio estaba sujeto al criterio de unanimidad, matizado por el principio de la buena fe. La cuestión ahora planteada es si los demandantes probaron su buena fe. Claro, tratándose del referido principio general, estos disfrutan una presunción de buena fe.[67] La pregunta a dirimir, entonces, es si la prueba estableció preponderantemente los hechos constitutivos de mala fe.

A dicha pregunta nos enfrentamos con la acostumbrada deferencia hacia las determinaciones fácticas del Tribunal de Primera Instancia. Éstas deben prevalecer en la medida que reflejen su apreciación de la prueba testifical y no existan circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. La prueba documental, en cambio, es susceptible de una evaluación independiente por parte de este Tribunal, encaminada a determinar si dicha prueba suscita una convicción firme y

---

[67] Dado que nuestro análisis procede al amparo de la Ley de Propiedad Horizontal, y del principio de la buena fe, nada resolvemos con respecto a si el artículo 38-C(d) de la Ley de Condominios está exento de la presunción general de buena fe.

definitiva de que erró el juzgador en su apreciación. Igual deferencia observamos cuando se impone la necesidad de hacer un balance entre la prueba testifical y la documental. Véase, *e.g.*: *Abudo Servera v. Autoridad de Tierras*, 105 D.P.R. 728, 731 (1977); *Gallardo v. Petiton García*, 132 D.P.R. 39, 56 (1992); *Fernández v. Hosp. Gen. San Carlos*, 113 D.P.R. 761, 773 (1983).

**2.**

La *Sentencia* del Tribunal de Primera Instancia determinó que los demandantes-recurridos objetaron el cambio de uso de la oficina 518 porque decidieron oponerse a cualquier cambio de uso. Dicho foro tuvo ante sí el testimonio de ambos demandantes, quienes hicieron referencia al problema de la "mega-práctica" y a su interés económico en controlar el número de oficinas de cardiología. Sin embargo, expresó en sus determinaciones de hechos el foro primario:

> Los demandantes se opusieron mediante carta del 20 de junio de 2002, dirigida al Sr. Quiñoy en la que escuetamente indicaron su oposición al cambio de uso propuesto para la oficina 518. No ofrecieron fundamentos para su oposición. Surge así mismo de la prueba, que el doctor Serrano se ha opuesto a otros cambios de uso de primera venta aunque nada tenían que ver con su especialidad. En específico, los demandantes no se habían opuesto anteriormente en el 2001 al cambio de especialidad de la oficina número 509 para cirugía de colon y recto, pero posteriormente decidieron oponerse, sin dar razón alguna. Declaró el doctor Serrano que se hubiera opuesto a cualquier cambio de oficina, incluso si meramente se tratara de un trueque de ubicación aunque con ello no se afectara el número de oficinas dedicadas a cardiología ni se afectara su práctica.

Sentencia TPI, *supra*, págs. 959-960.

Nos corresponde examinar si esta apreciación es

claramente errónea, según los criterios antes indicados. La prueba testifical pertinente contiene declaraciones tendientes a confirmarla. Su mejor ejemplo surge del contrainterrogatorio que realizó el Lcdo. Godreau al Dr. Serrano Muñoz:

> P:   ... Doctor, dígame si es o no cierto que usted **actualmente** se opone a cualquier tipo de cambio que se haga de uso específico de una oficina en la Torre de Auxilio Mutuo... Usted, incluso, se opone a un trueque de ubicación.
>
> R:   Es correcto. **Y me opongo...porque hay un precedente previo**...y hubo una oposición...
>
> P:   Fíjese, doctor, esa no es la pregunta.
>
> R:   […] y se respetó […]
>
> P:   La pregunta no es esa, doctor, la pregunta es si usted ahora mismo se opone a cualquier trueque.
>
> R:   ¿Trueques […] a los trueques? **Me opongo a cualquier trueque.**
>
> P:   Okay. O sea, ¿aunque no se afecte el número de oficinas de Cardiología?
>
> R:   **Aunque no se...afecte el número de oficinas porque estas oficinas tiene cada una un uso y para cambiar ese uso hay un procedimiento.**
>
> P:   Doctor, ¿y en que forma le afecta a usted el trueque...si al fin y al cabo queda el mismo número de oficinas de Cardiología y queda el mismo número de oficinas de la otra especialidad? ...
>
> R:   **Hay una ley que hay que respetarla. Yo entiendo,** y aquí se me hicieron […]
>
> P:   No, no, no, la pregunta no es si hay que respetar la ley, ¿en que le afecta a usted directamente?
>
> R:   Me afecta que se violen las restricciones establecidas […]
>
> . . .
>
> P:   ¿Perdón?
>
> R:   Me afecta desde el punto de vista que se violen las restricciones establecidas para el condominio y que esto en el futuro, pues se puede prestar para que esto se modifique […] Yo no creo que, por ejemplo, un cardiólogo, que esté en el cuarto piso, le interesa que vengan cinco cardiólogos más a ese piso después. Y ha habido

[…] digo, ese tipo de circunstancia puede ocurrir. Transcripción de la Vista en su Fondo del 27 de febrero de 2004, Apéndice I, págs. 222-224.

El caso de la oficina 509 ofrece otro ejemplo. No hubo oposición del Dr. Serrano Muñoz la primera vez que se intentó cambiar el uso. Presentada la demanda de epígrafe, éste objetó otra propuesta de cambio, cuya realización no hubiera afectado el número de oficinas de cardiología. Su carta en oposición citó como fundamento la Escritura Matriz, el reglamento y "las representaciones que le fueron hechas al suscribiente y los otros compradores". Luego hizo referencia al litigio pendiente y añadió, "le sugeriría que hasta tanto no se emita un dictamen en dicho pleito se atenga la [SEAM] a las oposiciones válidas como la del suscribiente, amparadas en ley y de acuerdo con la escritura Matriz, el Reglamento...y ARPE." Durante la vista en su fondo, explicó el Dr. Serrano Muñoz que su intención era preservar el *status quo* hasta tanto hubiese un dictamen judicial. Pero el tribunal no acogió esa interpretación de la referida carta y de su oposición. Éste determinó que los demandantes se opusieron "sin dar razón alguna". Carta del Dr. Serrano Muñoz al Sr. Quiñoy de 16 de agosto de 2003, Apéndice I, pág. 865; Transcripción de la Vista en su Fondo del 27 de febrero de 2004, Apéndice I, págs. 236-239.

En fin, el juzgador de los hechos aquilató la prueba testifical, adjudicó la credibilidad de los testigos y entendió que el Dr. Serrano Muñoz se opuso al cambio de uso

de la oficina 518 porque decidió objetar cualquier cambio de uso.  Somos del criterio, ciertamente, que dicha prueba admite otras interpretaciones.  Pero no hallamos indicios de pasión, prejuicio, parcialidad, error manifiesto u otras circunstancias extraordinarias, que nos permitan descartar la conclusión del foro primario.  Por otra parte, la Mayoría descarta la adjudicación de credibilidad hecha por el foro sentenciador sin explicar en que consiste "la pasión, perjuicio y parcialidad o error manifiesto", que justifique descartar la apreciación de la prueba efectuada por el juzgador.  Discrepo de este curso de acción.

La prueba documental, a su vez, no suscita una convicción firme y definitiva de que las determinaciones del foro primario son incorrectas.  Por ejemplo, el 6 de junio de 2002, el Sr. Quiñoy remitió una carta al Dr. Serrano Muñoz proponiendo un cambio de uso para la oficina 218.  Los pormenores de la propuesta surgen de dicha misiva:

> ...las doctoras Idelisa Borges y María E. Ramos, cardiólogas, desean adquirir la oficina 218 para el uso de Cardiología.  La oficina 218 está dispuesta actualmente para el uso de Cirugía General y de la Mano.  El uso actual sería eliminado.  El Consejo de Titulares mediante carta circulada a ustedes el 12 de febrero de 2002, solicitó cambiar el uso de las oficinas 217 y 218 a uso común pero posterior a esta carta el 26 de abril de 2002 el Dr. Manuel Miranda nos escribió [sic] indicando que el Consejo de Titulares sólo desea comprar la 217 para destinarla a uso de área común.  El uso original de la oficina 217 la cual se quiere cambiar a un uso de área común es de Cardiología.  Estaríamos transfiriendo este uso de Cardiología de la oficina 217 a la oficina 218.

Apéndice I, págs. 845-846.  El Dr. Serrano Muñoz rechazó la propuesta mediante su carta de 12 de junio de 2002 al Sr.

Quiñoy: "Me opongo al cambio de uso propuesto por usted para la oficina 218." Estos hechos, coetáneos con los de autos, sugieren que el Dr. Serrano Muñoz se oponía a los cambios de uso que no implicaran una mega-práctica de cardiología ni un aumento del número de tales oficinas. Ello corrobora en cierta medida la apreciación que hizo el juzgador de la prueba testifical. El contenido de esta comunicación fue soslayado en la Opinión del Tribunal.

**3.**

Lo antes expuesto, a mi juicio, nos impide intervenir con la determinación medular del Tribunal de Primera Instancia, a saber, que los demandantes-recurridos se opusieron al cambio de uso de la oficina 518 porque decidieron oponerse a cualquier cambio de uso. Ese fundamento, a su vez, es equivalente al simple ejercicio de una facultad condominal. Por ello concluimos que la oposición al cambio de uso de la oficina 518 reflejó un estado subjetivo contrario al principio general de la buena fe. Dadas las circunstancias particulares de este caso, basta con dicho estado anímico para configurar una infracción del referido principio,[68] infracción que nos lleva a

---

[68] Al resolver que se ha configurado una infracción del principio general de la buena fe, estamos evaluando la oposición de los demandantes-recurridos con un criterio puramente subjetivo. Así procedemos porque los alegatos y los dictámines bajo consideración han dejado de problematizar el asunto. No debe entenderse que rechazaremos la posibilidad de acoger una metodología objetiva o ecléctica cuando la controversia se halla planteado adecuadamente.

confirmar el acuerdo objetado.[69]

## VII.

En virtud de los fundamentos expuestos, disiento del curso de acción de la mayoría y en su lugar dictaría sentencia revocando la *Sentencia* recurrida y en consecuencia desestimaría la demanda de epígrafe, excepto que confirmaría la determinación del foro recurrido con respecto a la ausencia de temeridad.

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[69] Este resultado hace innecesario que discutamos el planteamiento sobre tercería registral. En cuanto a la temeridad de los demandantes-recurridos, compartimos el criterio del Tribunal de Apelaciones.